708 P.2d 102

The STATE of Arizona, Appellee,

v.

Walter Robert LEE, Appellant.

No. 2 CA–CR 3478.

Court of Appeals of Arizona,
Division 2, Department A.

July 25, 1985.

Review Denied Aug. 16, 1985.

**12**

Robert K. Corbin, Atty. Gen. by William J. Schafer III and David R. Cole, Phoenix, for appellee.

Frederic J. Dardis, Pima County Public Defender by Constance L. Trecartin, Tucson, for appellant.

## OPINION

FERNANDEZ, Judge.

Appellant was charged with 33 counts involving 13 incidents which occurred in Tucson between October 7, 1982, and March 21, 1983. At the conclusion of a nine-day trial, the jury convicted appellant of 29 counts, including seven counts of sexual assault, one count of attempted sexual assault, one count of sexual abuse, three counts of robbery, one count of armed robbery, six counts of burglary and ten counts of kidnapping. The jury also found the allegations of prior convictions and dangerousness to be true. The trial judge sentenced appellant to the presumptive term for each offense taking into consideration the dangerousness of the offenses and prior felony convictions. The sentences for all counts within each incident are concurrent, and the longest sentence for each incident is consecutive to the prior incident. The total sentence imposed is 170.5 years.

Appellant has assigned four errors of the trial court as follows:

1) Refusing to ask requested voir dire questions dealing with racial prejudice;

2) Admitting the result of a serology test that was disclosed after the trial had begun and in which the evidence was destroyed in performing the laboratory test;

3) Denying appellant's motion to sever various counts; and

4) Imposing an excessive sentence.

We affirm on all counts.

On October 7, 1982, P.T. (all victims are females and hereinafter referred to by their initials only), a 20-year-old woman walking home from school, was attacked from behind. Her assailant dragged her down an alley where he shoved dirt into her mouth, jammed a T-shirt into her mouth, wrapped another around her eyes, and secured her brassiere around the shirt, put his belt around her neck, struck her telling her to keep quiet, and threatened to kill her if she did not. He then ordered her to perform fellatio upon him, and when it became apparent that she did not know how, he raped her.

N.S., a 22-year-old, was attacked from the rear in an alley on November 2, 1982, while walking home from a Circle K. Her assailant told her to shut up and tied her hands behind her back with a belt. He then forced her to the ground after covering her eyes with his jacket. He told her he wanted her to fellate him, and he ejaculated a few moments after placing his penis into her mouth. He then removed the belt, re-tied her hands with a wire and left.

On November 15, 1982, Y.K., a 27-year-old, was dropped off by her boyfriend in the parking lot of her apartment at 1:00 a.m. Before she could reach her apartment she was attacked from the rear. Her assailant put a T-shirt over her face and a handkerchief or towel into her mouth. He then dragged her to a grassy area where he forced her to smoke marijuana with him and engaged her in forced intercourse. When he threatened to kill her, she offered him anything she had in exchange for her life. He then took her money and necklace.

On November 15, 1982, C.P., a 20-year-old was attacked from the rear at 8:45 p.m.

Her assailant put something made of leather around her mouth. The assailant hit her several times when she tried to look at him. When a neighbor came outside the assailant fled, eluding her boyfriend who had just come to her aid. Appellant was acquitted of kidnapping C.P.

On November 20, 1982, A.M., a 21-year-old returned to her apartment between 11:00 p.m. and 12:00 a.m. and was attacked by an assailant who leaped out of her bedroom closet. The assailant put his hands on her face, threw her on the bed, stretched her mouth apart and threatened to kill her. At one point he put a belt around her neck and demanded that she put her hands behind her back. She resisted, saying that she was expecting a friend. The assailant then asked her for money which he received, and he left. The jury acquitted appellant of attempted sexual assault on A.M.

On November 26, 1982, S.M., a 25-year-old was assaulted as she was unlocking the door to her home. The assailant blindfolded her and tried to tie her hands with a belt. A neighbor, a Tucson police officer, overheard the noise and knocked on the door. The assailant then ran into a bedroom, leaving the belt behind and fled, eluding the officer. Three fingerprints were found in the home which were later determined to be appellant's.

On December 2, 1982, A.N. discovered a man in her kitchen who backed her into her bedroom where he fondled her and forced her to perform oral sex on him. During the act he asked her who lived with her. After she told him that two males did, he got off and said he would not rape her. She later found that some money had been taken from her purse.

A.R. testified that during the evening hours of December 20, 1982, she was assaulted from the rear at Rincon High School. Her assailant said he wanted her "pussy" and tried to tie her hands behind her back. After a long struggle the assailant got up and ran away. She sustained several injuries as a result of the assault. A motorcycle brochure was found at the scene and later determined to contain one of appellant's fingerprints.

D.M., on February 5, 1983, was attacked in the laundry room of her house. The assailant pushed her down and told her not to scream because he had a knife. She felt it, decided it was a screwdriver and fought back while he attempted to cover her face with a T-shirt. He then tried to tie her arms with plastic wire, struck her several times and tried to choke her. Finally she was able to scream loudly and her assailant ran away. She discovered after the incident that the light bulbs on the porch and in the laundry room had been unscrewed.

Seventeen-year-old M.L. was attacked on February 7, 1983, as she walked out of the bathroom of her home. Her assailant tied her hands behind her back, put a sweater in her mouth and her robe over her eyes, and raped her. After searching her purse for money he left.

On February 9, 1983, 20-year-old J.F. was attacked from the rear while walking on North Wilshire. Her assailant tied her hands behind her back and put a cloth or leather bag over her head. He told her to shut up and forced her to fellate him. After he informed her she was not doing it right, he forced her to have vaginal and anal intercourse with him. He also performed oral sex upon her during the assault. He asked for money and took both cash and a Visa card from her purse. After he left, the victim ran to a nearby house for help.

Seventeen-year-old D.C. was attacked from the rear on February 21, 1983, near the intersection of 22nd Street and Alvernon. Her assailant pulled her into a nearby arroyo, told her he would kill her if she did not shut up and held a hand over her mouth. She resisted and was able to run away. Appellant was acquitted of kidnapping and robbing D.C.

A.P., age 26, was awakened by a noise at her home located near Craycroft and 29th Street on March 21, 1983. After seeing a man attempting to enter her window, she called the police and later heard a voice tell

someone to "freeze." A police officer who responded to the call testified that after parking his car a block away, he walked to the house where he saw a man walk from a window and unscrew a light bulb on the front porch. After the light went off the man returned to the window. The officer then identified himself and commanded the suspect to freeze. After a five minute chase, the officer caught the appellant who, during the chase, had dropped several items of clothing including a jacket, ski mask and a long sleeve shirt.

At the police station the appellant admitted that he was involved in some of the assaults, admitted that he used a belt to tie some of his victims and that he would see women walking down the street or going into their homes and sometimes he attacked them. He estimated the number of attacks to be six or seven and believed he had raped two women. He could not remember if there were more than six or seven attacks. He specifically remembered his assaults on A.M. and A.R. and denied assaulting S.M. He stated that he covered the faces of most of his victims so that they could not identify him, that he would sexually assault those women who did not resist him and that he hoped to get money or other items from them. The tapes of his statement were played for the jury. The appellant is a black man, and all victims are Caucasians, except one who is Oriental.

### Jury Voir Dire on Racial Prejudice

The appellant submitted several voir dire questions dealing with racial prejudice for the judge's consideration. All were refused, and instead the court asked the following:

"Let me talk for a moment about racial prejudice. Obviously, Mr. Lee is black. That has nothing whatever to do with this case or with his entitlement to an absolute fair trial. Is there anybody who has a problem with that, or an honest reservation about you [sic] ability to afford Mr. Lee a fair hearing and a fair trial, simply because of the color of his skin? Okay. Thank you."

Earlier in voir dire the court had asked the following:

"I think we have established that no one has any direct knowledge of the case, other than what we already have covered in the way of publicity which the case received. I guess I would like to begin this afternoon by talking about prejudice and bias. I think if we're honest with ourselves we have to admit that we got here today, we represent unique individual people. We all have our own life histories, our own educational background, our own life. It may be we grew up in some other state or jurisdiction where the law is different from the law that applies in Arizona. Those who have served on this jury must understand that whatever preconceived biases or notions or prejudices you might have would have to be laid aside and not permitted to serve as an influence in any decision you might make as a juror in this case.

"First of all, do I have a problem with that with anyone, and you needn't tell us the reason for whatever affirmative response there might be? Okay. Thank you."

Later the court made the following observations:

"As we go along, folks, again, you folks are not on trial here for anything and it is not my purpose or desire to embarrass anyone unnecessarily or to unduly pry. If I should touch upon an area that you know calls for an affirmative response, but it's something you'd rather not talk about in open court, I will give you a chance before I'm through, to talk about it here more privately at the side bar."

Appellant contends that the trial judge denied him due process and a fair trial when he failed to make a more extensive inquiry into the issues of racial bias and prejudice and that he should have asked his requested voir dire questions.

■ Beginning with *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931), the United States Supreme

Court has consistently held it is a violation of a defendant's constitutional rights to refuse to question a jury panel about racial or religious prejudices when the circumstances require it. In *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), a case in which the defense to the charge of possession of marijuana was that defendant had been framed because of his civil rights activities, the Court held that, because racial prejudice was an issue in the case, specific questions should have been asked about it. In *Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976), the Court held that *Ham* did not create a per se rule in this area and that questions specifically dealing with racial prejudice were not required in addition to general bias or prejudice questions in a case involving a black defendant charged with violent crimes against a white security guard. In *Rosales-Lopez v. United States*, 451 U.S. 182 at 190, 101 S.Ct. 1629 at 1635, 68 L.Ed.2d 22 at 29 (1981), the Court said:

"There is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups. As *Ristaino* demonstrates, there is no *per se* constitutional rule in such circumstances requiring inquiry as to racial prejudice. *Id.* [424 U.S.], at 596, n. 8, 96 S.Ct., at 1021, n. 8. Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion."

In this case the trial judge did inquire into any prejudice that any prospective jurors might have; therefore, the dicta in *State v. Lopez*, 134 Ariz. 469, 657 P.2d 882 (App.1982), that specific questions are required in a case involving a violent crime by a member of one race against a member of another, is not applicable. In *State v. Peeler*, 126 Ariz. 254, 614 P.2d 335 (App. 1980), a similar issue was presented to the court which ruled that the limited voir dire examination in the area was sufficient to insure an impartial tribunal.

█ We have examined the appellant's proposed voir dire questions and find many of them are irrelevant and do not constitute proper voir dire questions. We find that the trial court covered the area of racial prejudice sufficiently to insure appellant an impartial tribunal and to meet the standards set forth by the United States Supreme Court and the Arizona courts.

*Admission of Evidence of*
*Serology Testing*

On December 13, 1983, the third day of the trial, the appellant's attorneys advised the court that they had just been handed two crime laboratory reports dated that day, one dealing with the victim P.T. and the other dealing with the victim J.F. The appellant moved to preclude any testimony in connection with either report on the basis of untimely disclosure and, as to the report on P.T., on the further ground that the evidence had been destroyed in the testing and was not available for defense examination.

The court held a hearing the next day on the untimely disclosure complaint. Both parties agreed that all previous laboratory reports had been timely disclosed and that a new report had been prepared in connection with P.T. because the prosecutor had discovered that the initial testing had indicated appellant was not the person who had assaulted P.T. Since P.T. had probably engaged in sexual relations with her boyfriend the same day that she was assaulted, the prosecutor wanted to discover, to the extent possible, the source of the semen found in P.T.'s vagina and on her underpants and blue jeans. The subsequent tests indicated that appellant could not have deposited the semen that was found in her underpants and blue jeans but he could not be excluded as the individual who had deposited semen inside her.

With respect to J.F. (who was penetrated both vaginally, anally and orally), because of a discussion with the prosecutor, the

criminalist decided to double check his results, and he discovered that what he had thought was a vaginal swab was actually an oral specimen. Thus, the late report gave the result of his analysis on the oral specimen which indicated that the appellant could not be excluded as the individual who had assaulted J.F. As the record shows, the prosecutor did not fail to disclose anything. The prosecutor also had a duty to request additional testing when he learned of the possibility that appellant was not the person who assaulted P.T.

■ It is clear the trial court has discretion in determining what sanctions to impose when there has been untimely disclosure. *State v. Starks*, 122 Ariz. 531, 596 P.2d 366 (1979); *State v. Ramirez*, 116 Ariz. 259, 569 P.2d 201 (1977); *State v. Piedra*, 120 Ariz. 53, 583 P.2d 1373 (App. 1978). We believe that, since the reports were immediately disclosed after the prosecutor received them and since they involved test results that clarified previous reports, their admission was not improper.

With respect to the destroyed evidence issue, the prosecutor mistakenly believed that two slides were available for testing the vaginal smear of P.T. In actuality there was only one, and the smear was used entirely by the criminalist who conducted the test. The appellant concedes that no wilful destruction of evidence occurred but complains that he was prevented from conducting an independent test. In denying the motion to suppress, the court stated a *Willits*[1] instruction would be given so the jury could consider the fact that evidence was destroyed in determining whether appellant was guilty or not. This instruction was given.

■ When evidence has been lost or destroyed, the court will reverse if a defendant can show either bad faith or connivance by the prosecution or that the loss of the evidence prejudiced his case. *State ex rel. Hyder v. Hughes*, 119 Ariz. 261, 580 P.2d 722 (1978); *State v. Maldonado*, 138 Ariz. 475, 675 P.2d 735 (App.1983). Since it

is conceded there is no question of bad faith here, appellant must show how he was prejudiced by the destruction of the sample. The initial test result indicated appellant could not have been P.T.'s assailant. The subsequent result, however, did not conclusively prove appellant was guilty. It merely meant he was no longer excluded as the assailant. That result was consistent with the results that had been obtained from samples from several other victims. The test results indicated appellant fell in the class of O secretors as did the assailant, a category the criminalist testified included something like 50% of the population.

Defense counsel fully cross-examined the criminalist as to the circumstances of the sample's destruction and discussed the two opposing test results and their implications in detail in closing argument. It was also noted in the argument on the motion to preclude that the defense had not sought to retest any of the serology samples involved in the case.

"Thus, where evidence sought to be disclosed has been functionally destroyed, but was subjected to scientific testing by the state prior to its destruction, a defendant must show that a retest would have been possible and must challenge the state's test results, either by attacking the manner in which the test was conducted or by other evidence." *State v. Kersting*, 50 Or.App. 461 at 473, 623 P.2d 1095 at 1103 (1981), aff'd on other grounds, 292 Or. 350, 638 P.2d 1145 (1982); accord, *State v. Asherman*, 193 Conn. 695, 478 A.2d 227 (1984), cert. denied, — U.S. —, 105 S.Ct. 1749 [84 L.Ed.2d 814] (1985).

Appellant made no effort to attack the manner in which the test was conducted nor did he even question the criminalist as to the test method employed. The initial test result was favorable to appellant and that was fully disclosed to the jury.

"In the absence of bad faith or connivance on the part of the Government, destruction of evidence prior to trial does not

---

1. See *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964).

necessitate reversal of a conviction." *United States v. Henry*, 487 F.2d 912 at 912 (9th Cir.1973). We find appellant has failed either to show prejudice in the admission of the test result from the destroyed sample or any reason why it should have been suppressed.

Appellant contends the destruction of the sample was a violation of *State v. Mitchell*, 140 Ariz. 551, 683 P.2d 750 (App.1984), since the sample was not available for retesting by appellant. He concedes, however, that the facts in that case are not the same as here, and that distinction is dispositive. The semen sample was preserved for a period of fourteen months, nine of which were after appellant was indicted for the offense. During that time the sample was tested once by the state. Appellant made no effort to conduct his own test, and the state's second test was not conducted until the third day of trial. There is no question that *Mitchell* was complied with and does not apply to this type of situation.

### Denial of Motion to Sever Counts

Appellant's motion to sever the counts, seeking a separate trial on various groups of incidents, was denied. He contends that the trial court abused its discretion by so ruling, that he was prejudiced thereby, and that Rule 13.4(b), Rules of Criminal Procedure, 17 A.R.S., mandated a severance because the offenses were joined only because of Rule 13.3(a)(1). The state contends there was no abuse of discretion and that Rule 13.4(b) does not apply.

Extensive evidence, including a statement of stipulated facts, a map showing where the various attacks occurred, and a chart listing the similarities of the incidents, as well as testimony dealing specifically with the issue of severance, was presented to the court. This court notes the following similarities in the various incidents:

1) In all but one of the incidents the assailant grabbed or covered the mouth of the victim to prevent her from crying out. The one exception decided not to resist.

2) The assailant covered the eyes of eight of the 12 victims and told two others to close their eyes. Appellant admitted covering his victims' eyes in some cases.

3) In eight of the 12 cases an attempt (not always successful) was made to tie the victims' hands behind their backs.

4) In nine of the 12 cases the assailant either demanded money or actually robbed the victim.

5) The descriptions given by the victims were similar in terms of height and weight estimates.

6) The assaults all occurred in the same general area and appellant's address was located in that same area.

7) The victims were all white females and most were under the age of 27.

8) Appellant confessed to several of the crimes and stated that others sounded familiar. He denied the S.M. assault, but three of his prints were found inside her home. (He testified at trial that he and a friend had attempted to burglarize S.M.'s home and that the friend had attempted to assault her.)

9) The first in the series of assaults occurred within a month-and-a-half after the appellant arrived in Tucson, and no similar case in that area was reported between March 21, 1983, when appellant was arrested and August 22, 1983, the day the detective testified on the motion to sever.

The rules for joinder and severance must be read together. *State v. Newman*, 122 Ariz. 433, 595 P.2d 665 (1979); *State v. Henderson*, 116 Ariz. 310, 569 P.2d 252 (App.1977). Rule 13.3, Rules of Criminal Procedure, 17 A.R.S., states in part:

"a. Offenses. Provided that each is stated in a separate count, 2 or more offenses may be joined in an indictment, information, or complaint, if they:

(1) Are of the same or similar character; or

(2) Are based on the same conduct or are otherwise connected together in their commission; or

(3) Are alleged to have been a part of a common scheme or plan."

Rule 13.4 states in part:

"a. In General. Whenever 2 or more offenses ... have been joined for trial, and severance of any or all offenses, ... is necessary to promote a fair determination of the guilt or innocence of any defendant of any offense, the court may on its own initiative, and shall on motion of a party, order such severance.

"b. As of Right. The defendant shall be entitled as of right to sever offenses joined only by virtue of Rule 13.3(a)(1)."

We believe appellant is incorrect in his contention that the state's theory was that the cases were only joined because they were of the same or similar character (Rule 13.3(a)(1)) and therefore he was entitled to a severance as a matter of right (Rule 13.4(b)). The court stated in *State v. Rodriguez*, 145 Ariz. 157, 700 P.2d 855 (1984) as follows:

"In order for two crimes to be classified as a common scheme or plan under Rule 13.3(a)(3), Arizona Rules of Criminal Procedure, it is not necessary that the crimes be perpetrated in an absolutely identical manner, so long as the court perceives a sufficient similarity between the crimes to make it probable they were committed by the same person." 145 Ariz. at 170, 700 P.2d at 868.

■ We conclude the evidence produced at the hearing on the motion to sever was sufficient to warrant joinder on the basis of a common scheme or plan and that it met the standards of *State v. Perez*, 141 Ariz. 459, 687 P.2d 1214 (1984) and *State v. Tipton*, 119 Ariz. 386, 581 P.2d 231 (1978). There was no abuse of discretion in the denial of the motion.

### Excessive Sentence Contentions

The remaining issue raised by the appellant is that his sentence was excessive and imposed in violation of the Eighth Amendment's ban on cruel and unusual punishment. Appellant concedes that the Arizona legislature has the right to determine classes of felonies and to decide that dangerous and repetitive offenses should incur a higher penalty. *State v. McNair*, 141 Ariz. 475, 687 P.2d 1230 (1984). However, he challenges the right of a judge to impose consecutive sentences when the legislature has set no guidelines to limit the judge in making this decision.

■ A.R.S. § 13–708 expressly permits the imposition of consecutive sentences as long as the court states its reasons for doing so on the record. The trial judge stated his reasons as follows:

"Consecutive sentences are imposed in each case where I have so specified because of the extremely serious nature of the crimes in question, the unquestionably severe traumatic impact to the victims in this case, the repetitive nature of the acts and my honest belief that the defendant if released would pose an extreme danger to other people."

Those reasons constitute a sufficient basis for the court to impose consecutive sentences. See *State v. Meeker*, 143 Ariz. 256, 693 P.2d 911 (1984).

■ As to appellant's contention that the sentence constitutes cruel and unusual punishment, our supreme court recently upheld the imposition of three consecutive life sentences for nine counts of armed robbery and one count of aggravated assault, all of which were committed on the same evening. *State v. Perkins*, 144 Ariz. 591, 699 P.2d 364 (1985). In this case appellant committed 29 offenses over a period of five-and-one-half months against 11 different women, all of whom were either in their own homes or on a public street where they had every right to be. The evidence clearly justified the judge's conclusion that appellant posed a serious danger to society.

The appellant in this case was convicted of a large number of dangerous and repetitive offenses that are among the most serious of all crimes. We do not feel the sentence violates the Eighth Amendment's ban on cruel and unusual punishment.

The convictions as to all counts are affirmed.

BIRDSALL, P.J., and HOWARD, J., concur.