OPINION OF THE COURT
Stuart Namm, J.
The defendant, who was originally charged under one indictment, with one count of murder in the second degree, arising out of the shooting death of one Archimedes Cervera, and a second count of criminal possession of a controlled substance in the fourth degree, a quantity of cocaine, has since been acquitted of the murder charge after a trial by jury, but yet stands charged with the second count of the indictment, which was severed for trial purposes.
The second count arose out of the arrest of the defendant on *591 the original murder charge, it having been alleged that an inventory search of the defendant’s person and subsequent laboratory analysis revealed the presence of 3.9 grams or 0.13 of an ounce of cocaine in his trouser pocket.
Multiple pretrial hearings, which were concluded prior to the first trial, and which were the subject of a previous decision herein, were conducted simultaneously by the court, the subject of one being the question of whether there existed probable cause for the defendant’s arrest on April 3, 1984, the date upon which the alleged seizure took place.
Although that question was already answered in the affirmative in the previous decision, certain facts and circumstances which came to light during the conduct of the first trial necessitated a reevaluation sua sponte of this court’s decision on the question of probable cause and the defendant’s right to a fair trial. Although this court’s previous order constitutes the law of the case, justice dictates a reconsideration of that ruling in the light of the additional testimony and evidence adduced at a special hearing conducted in limine and continued subsequent to the jury’s "not guilty” verdict on the murder charge. In addition, there was raised a question of whether the integrity of the Grand Jury had been impaired by virtue of the testimony of the key prosecution witness, Michael Orlando.
Shortly after jury selection had been completed in the first trial, and after testimony had commenced, defense counsel, in an application to the court, raised the spectre of a failure on the part of the prosecutor to properly disclose Brady material which was available to him and/or Rosario material which should properly have been disclosed at the appropriate moment of trial. (See, Brady v Maryland, 373 US 83; People v Simmons, 36 NY2d 126; People v Rosario, 9 NY2d 286.)
Based upon the allegations of defense counsel, which provided more than some articulable basis for argument that material still in the possession of the prosecutor might be exculpatory, this court felt duty bound "to determine the merits of the request for disclosure”, and thus was constrained to override the prosecutor’s discretion in the selection and disclosure of Brady and/or Rosario material. (See, People v Consolazio, 40 NY2d 446, 453; People v Andre W., 44 NY2d 179.) Accordingly, a request was made for the prosecutor’s file which was examined in camera for the existence of such material. Because of the dearth — indeed the apparent nonexis *592 tence — of certain police reports, which in this court’s experience are routine in a murder investigation, let alone the murder of a practicing attorney in "gang-land fashion,” prudence dictated the conduct of a further inquiry, by way of a hearing outside of the presence of the jury, as to the existence or nonexistence of Brady and/or Rosario material which should properly have been disclosed to the defendant to ensure that his due process rights and his right to a fair trial were preserved.
The very disturbing facts which evolved from the aforesaid hearing, and other matters of concern which arose during the trial itself, resulted in five separate applications by defense counsel for a mistrial based upon alleged acts of prosecutorial and/or police misconduct. None of these applications has been seen by this court as frivolous or spurious in nature, and each was deserving of judicial consideration and an appropriate response.* Nevertheless, because of this court’s perception of the apparent weaknesses in the People’s case, the high likelihood of an acquittal in this case, the number of witnesses involved, and the time involved in the selection of a jury, this court chose to reserve decision upon these applications as an expeditious use of judicial time in an effort to avoid a second trial. Clearly, these applications for mistrial have been rendered academic by virtue of the jury verdict, but as one or another does impact upon the issue of probable cause and the defendant’s right to a fair trial, the same will be considered herein.
FINDINGS OF FACT
1. For the period between June 25, 1979 (nine days after the murder) and December 15, 1979, although the investigation was continuing apace and many interviews of prospective witnesses were being conducted, and meetings and conferences were being held with representatives of the Federal Bureau of Investigation with respect to this investigation, there exist no written reports or memoranda of any detective with respect to the investigation of the murder of Archimedes Cervera.
*593 2. Administrative Section of the Rules and Procedures of the Suffolk County Police Department, chapter 9, § 4.15 (A), regulating the use of supplementary reports, provides that the same should be used "to supply any additional information of material value to the investigation of the case.”
3. Within days after the murder, a responsible member of the community provided the investigating detectives with reliable information containing at least two leads relating to persons who had the apparent motive and capability to be involved in the murder of Archimedes Cervera, and each of whom had threatened bodily harm to Cervera. Although these persons were subsequently discounted as suspects, there exist no notes or reports relating to the investigation of these leads, or to substantiate the manner or means used by the investigating detectives to discount these persons as suspects in this murder case.
4. Although there was testimony of the aforesaid independent witness, who is a former member of the Suffolk County Legislature, with no apparent axe to grind, that written notes were taken by the investigating detective, and that the witness signed such notes which related to the leads provided by him, no notes presently exist, nor does there exist such signed document in the case file.
5. No interviews were ever conducted by investigating detectives of any of the alleged unindicted coconspirators or any of the persons named by the independent witness as possible suspects, although each of these persons was either a Suffolk County resident or was engaged in business within the county.
6. As of the date that the name of the defendant as the alleged perpetrator was given to the investigating detectives by a special agent of the Federal Bureau of Investigation, who had been given such information by a then somewhat questionable confidential informant, Michael Orlando, the homicide squad ceased to consider any other person as a suspect in the murder of Archimedes Cervera, other than the defendant and his alleged unindicted coconspirators.
7. On the date of the murder of Archimedes Cervera in his law office, a telephone answering recording device was affixed to his office telephone and operating, with calls being received and recorded on that date, including one call from his wife, one call from an alleged unindicted coconspirator, and one call from one of the persons named by the aforesaid legislator as having a motive to murder Archimedes Cervera.
*594 8. This telephone answering device, which was seized at the scene by investigating detectives, together with the recording cassette and its recorded contents, was initially forwarded to the property bureau for return to the estate of the deceased, but subsequently to be "held as evidence;” was publicly auctioned by the Suffolk County Police Department, for unknown reason, on May 19, 1984, approximately one month after the arrest of the defendant herein.
9. The recording cassette was subsequently recovered from the purchaser after this court commenced these proceedings, and was played back during same, but the recording is no longer inviolate, and there appear to be small sections which contain music and blank spots, in addition to various recorded messages.
10. Immediately after arraignment, defense counsel called for the production and preservation of any and all evidence in the possession of the Suffolk County Police Department, including, but not limited to, any and all tapes of recorded conversations, and original notes and memoranda of law enforcement officials, and the prosecution agreed to the preservation of same.
11. Prior to his waiver of immunity before the Suffolk County Grand Jury, Michael Orlando had not been granted immunity from prosecution for the murder of Archimedes Cervera.
12. Michael Orlando, the key prosecution witness and admitted murderer, upon whose credibility the police relied due to his knowledge of the circumstances of the death of Archimedes Cervera, had access to the means of death, a .32 caliber automatic pistol, at the time of the murder, and was on the streets and operating (committing crimes) within Suffolk County at or about the time of the murder of Archimedes Cervera. It was for these very reasons that the prosecutor insisted that Orlando waive his immunity before the Suffolk County Grand Jury, to ensure that if he had committed the Cervera murder, he could subsequently be prosecuted.
THE ARREST OF PETER CORSO: PROBABLE CAUSE
As hereinbefore stated, after a Dunaway hearing, this court previously arrived at the conclusion that the police, at the time of the defendant’s arrest, possessed the requisite "probable cause” to believe that the defendant, Peter Corso, had committed the murder of Archimedes Cervera on June 16, *595 1979. In order to reach such conclusion, this court gave full credence to the uncontroverted testimony of several police officers who were called to testify at the hearing, and cited the consistency of such testimony in support of their credibility.
At that time, however, this court, as a fact finder, did not possess the information which was elicited by way of testimony and documentary evidence at the hearing in limine and at the trial itself. Accordingly, the doctrine of "law of the case,” which is an extremely flexible one, and which relates to judicial economy, would not preclude a reconsideration of the issue of probable cause, especially where a constitutional right of the defendant is involved. (Cf. Baltimore Mail S. S. Co. v Fawcett, 269 NY 379, cert denied 298 US 675; People v Negron, 105 Misc 2d 492, 494, citing People v Blake, 35 NY2d 331.)
If this court were to reach the conclusion that the police did not have the requisite probable cause to arrest Peter Corso on April 3, 1984, then the cocaine which was allegedly seized from him during the course of an inventory search at the homicide squad would have to be suppressed. The evidence thus seized would have been as a direct consequence of the unlawful police action and, accordingly, would be tainted and suppressible. (People v Boodle, 47 NY2d 398, 401-402, cert denied 444 US 969.) This would not be the case where the connection between the lawless conduct of the police and the discovery of the cocaine on his person is " 'so attenuated as to dissipate the taint.’ ” (Wong Sun v United States, 371 US 471, 487, quoting Nardone v United States, 308 US 338, 341.) It was the arresting officers who, in this case, insisted that defendant empty his pockets, as part of the inventory search which revealed the existence of cocaine on his person.
More problematical, however, is the underlying question of probable cause, the same relating to the subjective reasoning of the police at the time of the arrest. Subjective though such reasoning may be, it is for a court, as a matter of law, to objectively weigh the evidence and testimony before it to determine whether such subjective reasoning was appropriate under the circumstances. "The question of probable cause is a mixed question of law and fact: the truth and existence of the facts and circumstances bearing on the issue being a question of fact, and the determination of whether the facts and circumstances found to exist and to be true constitute probable cause being a question of law.” (People v Oden, 36 NY2d 382, 384.)
*596 In that regard, the amount of credit to be attributed to the testimony of the investigating and arresting officers weighs heavily upon the ultimate question of probable cause. Thus, where the testimony of a police officer had all the appearances of "having been tailored” to nullify constitutional objections, the Appellate Division refused to crédit the testimony of the arresting officer. (People v Parmiter, 55 AD2d 938.) Likewise, where a police officer "conveniently suffered a lapse of memory” between hearing and trial, and was unable to recall certain details about the arrest, the same court held that it could not sanction judgment of conviction upon "palpably inherently inconsistent and contradictory testimony”. (People v McCormick, 39 AD2d 590.) As the Appellate Division once again opined in People v Garafolo (44 AD2d 86, 88), "In evaluating testimony we should not discard common sense and common knowledge.” Quoting from 22 New York Jurisprudence, Evidence, § 649 the court stated: " 'The rule is that testimony which is incredible and unbelievable, that is, impossible of belief because it is manifestly untrue, physically impossible, contrary to experience, or self-contradictory, is to be disregarded as being without evidentiary value, even though it is not contradicted by other testimony or evidence introduced in the case’ ” (supra, p 88; emphasis added).
This court finds it difficult to accept, and virtually incredible as a matter of law, that experienced police officers engaged in a major homicide investigation would permit a period of approximately six months to elapse, commencing nine days after the murder, during which time the investigation was continuing apace: prospective witnesses were being interviewed; likely suspects were being targeted; leads were being discounted; meetings were being held with representatives of other law enforcement agencies and other bureaus of the same police agency; without any supplementary report, as required by local police regulations, or any other report being written. This court reaches such conclusion, especially in the light of the disturbing testimony of the "lead” detective (the officer responsible for the direction and coordination of the investigation in 1979, 1980, 1981 and part of 1982 until his retirement) in response to questions put by the court and defense counsel. This witness, who testified about events which were almost six years old without the benefit of any written notes or reports, when asked about the existence of any written reports consistently asked to be shown the appar *597 ently nonexistent reports or memoranda to "refresh my memory.”
Because probable cause deals with the subjective reasoning of the arresting officer, and the same is measured by the standards to be applied by a " 'reasonable, cautious and prudent peace officer’ ” (People v Brady, 16 NY2d 186, 189, quoting Bell v United States, 254 F2d 82, 86, cert denied 358 US 885), this court is bound to cast the best possible light upon the testimony of the officers herein. Nonetheless, there is an aura which permeates the facts of this case which make it difficult — indeed impossible — to give credence to the testimony of the police officers involved. The explanations which have been offered for the nonexistence of routine reports and memoranda fly in the face of this court’s experience as a Trial Judge who has heard the testimony of many experienced police officers in cases equally as serious as the case at bar.
Clearly the investigating detectives reached the conclusion, sometime prior to April 1984, and perhaps as early as 1979, that the defendant, Peter Corso, was responsible for the murder of Archimedes Cervera. Such conclusion was based in large measure upon the statements of Michael Orlando, a person whose credibility had to be suspect, even when considered in its best light, since there was no other real evidence to connect the defendant to the murder, other than the belief that the defendant may have visited the office of the deceased on the date of the murder. Furthermore, the testimony of Orlando was not that of an eyewitness, but the testimony of one who claimed to have been given an inculpatory oral admission by his associate of many years. Armed with this information, and the knowledge that the defendant had a long criminal history and a business association with persons who may have had a motive to murder Archimedes Cervera, Peter Corso was targeted as the perpetrator, and all other persons, with equal or perhaps more motive to kill, were discounted or disregarded as suspects in the murder.
While CPL article 140 grants a police officer broad authority to arrest an individual without first having obtained an arrest warrant provided he has reasonable cause to believe that such person has committed such crime (CPL 140.10 [1] [b]), the ultimate arbiter of the appropriateness of such arrest, especially where there has been a seizure of alleged contraband, will be a court of law.
This court must decide, as a matter of law, whether the *598 evidence or information which appeared reliable at that time disclosed facts and circumstances which were collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that the murder of Archimedes Cervera was committed by Peter Corso (see, CPL 70.10 [2]).
Based upon the totality of the evidence presented: the nonexistence of reports and memoranda; the evasive nature of the testimony of the investigating detectives; the patent inconsistencies between the testimony of an independent witness with no apparent axe to grind and the testimony of the officers involved; and the almost cavalier attitude of the police in their testimony before this court; this court cannot, as a matter of law, conclude that there existed sufficient probable cause to arrest Peter Corso on April 3, 1984.
This court is constrained to reach such conclusion by balancing the collective questionable evidence then available to the arresting officers which they apparently acted in reliance upon, as against the other leads which had been provided by a reasonably reliable source, and which had not been followed to conclusion; or if they, in fact, had been, based upon the state of this record, this court cannot conclude, with any reasonable degree of confidence, that they would not have been sufficient and persuasive enough to give pause to any reasonable person before rushing to judgment as to the guilt of Peter Corso.
Accordingly, this court is constrained to suppress the quantity of cocaine which was purportedly seized from the defendant on the occasion of his arrest on April 3, 1984.
IMMUNITY WAIVER: GRAND JURY TAINT
A witness who testifies before a Grand Jury is automatically granted immunity from future prosecution as to any transaction about which he testifies unless he has executed a waiver of immunity. (CPL 190.40 [2] [a].) During the Grand Jury proceeding investigating the death of Archimedes Cervera, the prosecution’s key witness, Michael Orlando, executed such a waiver of immunity at the specific request of the prosecution.
The defendant argues, however, that this waiver of immunity by Orlando effectively misled the Grand Jury into believing that he could be prosecuted for the murder of Archimedes Cervera if evidence surfaced pointing to his involvement in the crime. This belief, the defendant argues, was erroneous *599 since Orlando had been granted full immunity from prosecution by both Federal authorities and the District Attorney of Bronx County. Aware of this immunity grant, the defendant argues that it was incumbent upon the Suffolk County prosecutor presenting the matter to the Grand Jury to fully disclose to it the true status of Mr. Orlando concerning his liability for prosecution. Furthermore, Michael Orlando testified at trial that he believed he had been granted complete immunity from prosecution, including prosecution for the murder of Archimedes Cervera.
This court agrees that the prosecution had an affirmative duty to reveal to the Grand Jury the true legal status of Michael Orlando concerning the scope of the immunity granted to him as such relates to the slaying of Cervera. Denial of this information, or the inaccurate portrayal thereof, intentional or otherwise, would certainly constitute prosecutorial misconduct. Such conduct, if true, would deprive the Grand Jury of vital information which directly impacts upon their ability to assess the credibility of testimony linking the defendant, Peter Corso, to the crime being investigated. In such an instance, dismissal of the indictment would be warranted since such prosecutorial misconduct clearly impairs the integrity of the Grand Jury process thereby severely prejudicing the defendant. (CPL 210.35 [5].)
However, such a result is not warranted in this case. The court is convinced that no prosecutorial misconduct occurred resulting in the deception of the Grand Jury as to the scope of immunity granted Michael Orlando. When Orlando testified before the Grand Jury in April 1984, the District Attorney of Suffolk County and his agents were not aware of the scope of immunity granted by the Bronx County District Attorney to him for his later testimony in a Grand Jury proceeding in that county some four months after his appearance in Suffolk County. Moreover, the extent of the knowledge possessed by Suffolk County officials concerning the immunity granted by Federal authorities was limited to the crimes admitted by Orlando and which he had revealed to agents of the F.B.I. during "de-briefing” sessions with them prior to his entrance into the Federal Witness Protection Program. Such admitted crimes committed by Orlando did not include the murder of Archimedes Cervera. This court gives little credence to the testimony of Michael Orlando that he had been granted full immunity from prosecution by the District Attorney of Suffolk *600 County, despite the execution of a waiver of immunity before the Grand Jury.
Therefore, the court concludes that the prosecution did not engage in any misconduct, intentional or otherwise, concerning their representation of Orlando’s true immunity status before the Grand Jury which indicted Peter Corso.
SPOLIATION OF EVIDENCE
It is undisputed that on the date of the murder of Archimedes Cervera in his law office, his office telephone was connected to a Sanyo telephone cassette recording device which recorded all incoming telephone calls on that day, until such time as the same was seized by investigating detectives and inventoried by the detective in charge of the crime scene. Although the cassette recording apparently contained a message from one of the persons named by the independent witness as having a motive to kill the deceased, and a message from one of the alleged unindicted coconspirators, as well as messages from the deceased’s wife and other persons, no typewritten transcript was ever made of the contents of the recording, nor were any real efforts made to retain this recording as evidence, despite assurances by the prosecution at the early stages of this case to preserve any and all tapes of recorded conversations.
Although at some point in the investigation some member of the homicide squad instructed the police property bureau to hold the recorder and recording as evidence, it is clear that the initial instructions, for whatever reasons, by the detective responsible for the murder scene was to the effect that the recording device and its recorded contents were to be returned to the estate of the deceased. For no apparent reason, however, on May 19, 1984, after the arraignment of the defendant, and after defense counsel had called for the preservation of all recorded conversations, the tape recorder and the cassette recording contained therein were publicly auctioned by the property bureau.
Such action by agents of the Suffolk County Police Department constituted, at the very least, gross negligence, and at its very worst, the spoliation of evidence which might have been useful to the defense of Peter Corso. The existence of the telephone answering device and the recorded contents was never been brought to the attention of defense counsel or the court until the commencement of this hearing in limine.
*601 The prosecution, including its police agents, are under a constitutional duty to preserve evidence that might be expected to play a significant role in the suspect’s defense. Due process requires no less to protect the innocent from erroneous conviction and to ensure the integrity of our criminal justice system. (California v Trombetta, 467 US 479.) Clearly such obligation extends only to potentially exculpatory evidence, but where there has been a permanent loss of evidence, such as in the present case, "courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.” (467 US, at p 486.)
However, it is not for the prosecution, or the police, to select which materials should be preserved, and which should be destroyed. Were law enforcement officials empowered to pick and choose the materials deemed worthy of preservation, then the due process rights guaranteed by Brady would be shallow indeed: Brady could be circumvented by merely destroying evidence favorable to the prosecution before it is demanded by the defendant. (People v Saddy, 84 AD2d 175, 178, citing United States v Bryant, 439 F2d 642, 648.)
In this case, the prosecution, only by a fortuitous stroke of luck, was able to recover the tape from its purchaser at auction. Thereafter, the same was played in open court and marked as a court exhibit during the course of the instant proceedings. Nevertheless, because the contents thereof had not been preserved by transcript, memorandum or otherwise, and the tape is no longer inviolate, it is impossible for this court to make a judicial determination as to the material value and import thereof to either the prosecution or the defense.
It is necessary, however, to evaluate the prosecution’s conduct in the context of the entire record. If there would be no reasonable doubt as to the guilt of the defendant whether or not the additional evidence is considered, the courts will not be inclined to impose sanctions. On the other hand, if the case against a defendant is built upon less than firm ground, "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.” (United States v Agurs, 427 US 97, 113.) Accordingly, the importance of the auctioned tape to the defense must be considered in the light of the case against the defendant, and against the background of an investigation which is virtually devoid of written notes *602 and reports at a time when the defendant was targeted as the perpetrator, and others equally capable of the murder were discounted as suspects. In other words, it is essential to look at the totality of the circumstances as they existed in the latter part of 1979, for by that time, although the F.B.I. had not turned over the name of their confidential informant to the investigating detectives, Peter Corso and his unindicted coconspirators were the prime — indeed the only — targets of the investigation.
While such events were taking place some four and one-half years before the arrest of Peter Corso, a scenario had already been created by reason of investigative malfeasance and nonfeasance which would make it virtually impossible to evaluate the police activity in an effort to determine the significance of the information provided with respect to other persons capable of the murder. Measured against the strength of the People’s case, which was built upon something less than firm ground — the testimony of an admitted murderer, hijacker, arsonist, robber and liar — one cannot help but come to the conclusion that the missing evidence would have to affect the outcome of a trial in favor of the defendant. Although it might be argued that this evidence does not bear any direct relation to the second count of the indictment, the actions of the prosecution team, which of necessity includes the investigating detectives with respect to the underlying charge, resulting in the loss of evidence, or lack of evidence, in apparent violation of existing police regulations, casts a negative shadow upon the second charge. But for the growth of the poisonous tree, in the form of the murder charge, the fruit, in the form of the drug charge, would never have blossomed.
The most difficult choice faced by any court is the remedy to be fashioned for prosecutorial or police conduct which inhibits the defendant’s right to a fair trial. While the cases are legion wherein sanctions have been imposed by the courts: for the erasure of certain tape recordings (People v Saddy, supra); for the failure to preserve the perpetrator’s blood stains (People v McCann, 115 Misc 2d 1025); for failure to provide laboratory test results to defense counsel (People v Kitt, 86 AD2d 465); for failure to disclose an alleged promise made to the key prosecution witness of immunity in exchange for his testimony (Giglio v United States, 405 US 150); for failure to preserve a breathalyzer ampoule (People v Molina, 121 Misc 2d 483); for the failure to preserve the fruits of the crime (People v Davis, 105 Misc 2d 409, affd 109 Misc 2d 230); for the failure to preserve *603 a tape recording of the criminal transaction (United States v Bryant, supra); for failure to produce notes of an interview of a prosecution witness (People v Day, 102 Misc 2d 11); and for failure to preserve notes of an interview of the defendant (People v Fleishman, 92 Misc 2d 156); this court is not aware of any case where the extreme sanction of dismissal of the indictment has been imposed for the willful or grossly negligent spoliation of a tape recording which did not strike at the very heart of the question of guilt or innocence, or for the nonexistence of notes or reports relating to interviews of witnesses resulting in the discounting of certain persons as targets of the investigation. Neither is this court aware of any reported case where the combination of circumstances were sufficient as in the instant case, to cast a doubtful light upon the entire prosecution case. Thus, even if this court had reached the conclusion that there was sufficient probable cause to arrest the defendant on April 3, 1984, the interests of justice would dictate a dismissal of the entire indictment. To do less would be to sanction police conduct which has been proven to be questionable at best, and which threatens the integrity of our system of justice.
CONCLUSION
On July 9 and July 12, respectively, this court directed, in order that the defendant’s right to a fair trial be preserved, that all of the attorneys involved in the case, including the District Attorney himself, and the Democratic candidate for District Attorney, refrain from making any comments to the news media about the merits of this indictment or the jurisdiction of this court to conduct a hearing in limine. This was done with great reluctance because it had become abundantly clear that the discussion of this case and the issues involved therein had become a political issue which threatened the integrity and independence of this court and the integrity of the entire judicial system, not to mention the impact such a public discussion would have upon this court’s ability to obtain a fair and impartial jury for the second trial. Those concerns have now been rendered academic and moot by virtue of this decision, and the "gag” orders thus imposed are hereby lifted.
Furthermore, the application to dismiss count two of the indictment is hereby granted, and bail will be exonerated.

 1. Spoliation of evidence — detective’s notes and/or supplementary reports; 2. Failure to preserve evidence — a telephone answering device and cassette recording contained therein; 3. Abuse of a Grand Jury subpoena; 4. Knowingly permitting a prosecution witness to state: "I know Pedro Corro [the defendant] killed my father!”; 5. Permitting the key prosecution witness to waive his immunity before the Grand Jury, although he had already been granted immunity from prosecution.