734 P.2d 597

**STATE of Arizona, Appellee,**

v.

**Edward G. ESCALANTE, Appellant.**

**Nos. 1 CA–CR 8949, 1 CA–CR 8965.**

Court of Appeals of Arizona, Division 1, Department A.

July 17, 1986.

Review Denied March 31, 1987.

**56**

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Chief Counsel, Crim. Div.

Jack Roberts, Asst. Atty. Gen., Phoenix, for appellee.

Thomas A. Thinnes, P.A., by Thomas A. Thinnes, Martin Lieberman, Phoenix, for appellant.

## OPINION

KLEINSCHMIDT, Judge.

The appellant, Edward G. Escalante, was convicted of five counts of sexual assault, two counts of kidnapping, and two counts of aggravated assault following a trial by jury. The charges arose out of two separate incidents, each involving a different victim. The appellant raises a number of issues on appeal, but we find one of them dispositive and therefore do not consider the rest. The dispositive issue is whether the trial court erred in failing to dismiss the charges against the defendant because the state did not preserve semen samples that had the potential to exonerate the appellant completely. We hold that the trial court did err, and we reverse and remand with directions to vacate the sentences imposed and to dismiss.

In the spring of 1984, two women were accosted eleven days apart by a man in Tempe who forced each one of them into a vehicle at gunpoint, drove them to remote locations, and sexually assaulted them. Several weeks after the second woman was attacked she happened to see the appellant, Edward Escalante, at the drive-in restaurant where she worked. She believed that Escalante was her assailant. The police showed both victims a photo lineup that included the appellant's picture. When both victims selected Escalante as the attacker, the police procured a search warrant for his home and seized a sweatshirt, a green box similar to one described by one of the victims as having been in her attacker's car, and a pellet pistol that resembled a revolver. Because the resolution of this case requires us to assess the weight of the evidence against the defendant, we set forth the facts in detail.

## THE FIRST INCIDENT

On the evening of March 20, 1984, the victim, W., a student at Arizona State Uni-

versity, was playing backgammon and watching television in a dormitory. She had arrived at the dorm between 6:00 and 8:00 p.m. and during the course of the evening she drank, at the most, two-and-a-half mixed drinks.

At about 11:30 p.m. W. left the dorm and was walking down the street when she was approached by a man who asked her the time. The man had a pistol, and he forced her into a car parked in a nearby lot, hitting her in the head with the pistol in the process. Inside the car W. was forced to lay on the front seat on her stomach. The back of the seat was folded down and she saw a green box behind the driver's seat. The assailant taped W.'s hands behind her back and stretched the seat belt across her, holding the loose end of the belt down with his hand to restrict her movements.

The man drove for between ten and thirty minutes. He stopped the car and ordered W. to get out. He cut the tape that bound her and led her across a field for about 400 feet. He forced W. to undress and told her that if she cooperated she would get out of the situation alive. He forced her to commit fellatio upon him, and he raped her vaginally and anally. He blindfolded her with her blouse and urinated on her. He told her that he had her wallet so he knew where she lived and that if she reported the assault he would harm her. After the assailant left, W. found her clothes and walked until she was able to flag down a passerby who drove until they found a policeman. The passerby's automobile was a hatchback.

W. was taken to a hospital and questioned by the police. She described her attacker as a short, white, obese male, 35 to 45 years old, wearing a hooded sweatshirt. She described her assailant's car as a white, foreign, compact hatchback. She told the police that her assailant carried a small revolver. In fact, Escalante is a Mexican-American male, who at the time was 25 years old, and who is 5'10" tall and weighs 240 pounds. The gun that was eventually seized from him is quite large, and his automobile is not a hatchback. When she was questioned at the hospital

W. was not particularly cooperative with the police because she was not sure that she wanted to pursue a prosecution. She testified at trial that while at the hospital she simply answered "yeah" to specific questions the police put to her.

Two days after she was assaulted, W. saw a man who she believed looked very much like her attacker while she was attending class. The police investigation of this lead was dropped when this suspect's car was found not to match the description of the assailant's automobile.

On May 7, 1984, some six weeks after the incident, W. was shown a photographic lineup consisting of six pictures. She chose the photo of the defendant as the one most closely resembling her attacker. She could not, however, make a positive identification. While we need not go so far as to say that the photo spread was unduly suggestive, it certainly could have been better. Both victims described the rapist as obese, and the appellant is the heaviest subject depicted in the lineup. Some of the men depicted in the lineup are not overweight at all. When she was shown a photograph of the defendant's Toyota, which generally fit the description of the assailant's car, W. could not be sure that it was the car in which she had been abducted. She continued to maintain that her assailant's car was a hatchback.

W. had also been interviewed by the appellant's attorney. To him, she described her attacker as between 5'10" and 6' tall, fat and flabby, with a dark complexion and a thin mustache. She said that he wore wire-framed glasses and that the bottoms of the frames might have been of flat plastic. She never saw the rapist's hair. The defendant's mustache was, in fact, not thin but very full.

At trial, W. was not able to identify the defendant positively. At one point she said that her attacker was black, and she conceded that she had tried to avoid looking at him. Although she had previously described her assailant's revolver as small, and the one seized from the appellant was quite large, she said that the appellant's pistol was similar to the one used by her

attacker. She also said that the green box she had observed in her attacker's car was similar in size and color to the one seized from the defendant. The appellant's green box had two black speakers on top that were fairly obvious and which W. had not mentioned. She testified that she might not have "picked up on" the speakers. She also described a hooded sweatshirt seized from the defendant as being similar to one worn by her attacker.

## THE SECOND INCIDENT

The incident involving the second victim occurred on March 31, 1984. The victim, S., had gone to a bar in Tempe at about 8:00 or 8:30 in the evening with her sister and her sister's husband. After the bar closed she stayed with some band members for about one-half hour until 1:30 a.m. She had drunk five or six tequilla sunrises over the course of the evening.

S. began to walk home from the bar when a man driving a Chevrolet Blazer pulled up beside her. He had a gun with a long barrel, and he told her to get in the truck. He drove her to a parking lot where he stopped, taped her hands, and placed her in the back of the Blazer. Telling her to "shut up or I'll kill you," he started up and drove for another five minutes. He took her out of the Blazer and walked her twenty to thirty feet away. He took her clothes off and untaped her hands. He forced her to commit fellatio upon him and then raped her vaginally. He told her that he was going to have anal intercourse with her, but at this point he simply left without doing anything more.

S. put her clothes on and was ultimately taken to a hospital where she was interviewed by the police. She was initially so hysterical that she was incoherent, but she eventually described her attacker as an obese white male, 30 to 35 years old, 5'9" to 6' tall with a medium mustache and wearing ear-length hair. She described her attacker's vehicle as a yellow and brown or beige Chevrolet Blazer. She told the officer that she had managed to escape from her attacker by hitting him with a stick, a story which she later said was completely untrue. S. was not able to give any further description of the weapon or of the clothes worn by her attacker.

The day after she was assaulted, S. saw a vehicle she believed was her attacker's driving by her house. Although at trial she testified that she did not see the driver, she reported to the police that the man driving was her assailant. A police investigation exonerated this man. Within the weeks that followed, S. saw two more individuals who she thought were her attacker. She attempted to follow one of them but could not follow the other because his car was headed in the opposite direction as hers. About three weeks after the attack, S. saw Edward Escalante when he drove through the line at the drive-in restaurant where she worked. She believed that he was the rapist, and she notified the police. They found the appellant by tracing his license plate.

On May 8, 1984, S. was shown a photo spread which included the appellant's picture, and she identified Escalante as her attacker. She was quite certain about her choice but said that the appellant's glasses seemed to be different. She ultimately identified photos of the appellant's Blazer as resembling the vehicle driven by her attacker although some minor details about the attacker's vehicle as she described it were inconsistent with the appellant's vehicle. Escalante testified at trial and denied that he had attacked the two women. He was not able to account for his whereabouts on the occasion of the two assaults.

## FAILURE TO PRESERVE EVIDENCE

Before trial the defendant moved to dismiss the indictment because the state, by failing to freeze underwear taken from the victims, had permitted semen stains to deteriorate to the point where they could not be scientifically tested. The motion, which the court denied, was based upon a stipulation between the state and the defense which read:

The parties, by and through their attorneys undersigned, hereby stipulate that, if called to testify, Keith E. Peterson Inman would testify as follows:

1. That he is [a] qualified forensic scientist as evidenced by his curriculum vitae, attached hereto and incorporated herein.

2. That phosphoglucomutase (herein PGM) testing is considered reliable and used routinely by the forensic community in sexual assault cases.

3. That PGM testing possesses the capability of excluding an accused in a sexual assault case as the semen donor. Assuming an accused is, in fact, not the semen donor in the particular sexual assault, this test possesses the capability of proving that fact.

4. That even if an accused is not eliminated by ABO testing, he may still be eliminated by the PGM test. They are different 'markers.'

5. That the ability to perform PGM testing depends on three criteria. The first is known as the 'post-coital interval,' which must be less than six hours. The post-coital interval refers to the time of the ejaculation of semen and the collection thereof on a swab or, alternatively, the ejaculation of the semen, its deposition on the victim's underwear and the drying of that semen on the underwear. The second criteria is how much semen is present on the sample and, finally, the third criteria is how the sample is stored.

6. That he received the physical evidence from both of the assault cases involved in State v. Escalante, Maricopa County Superior Court No. CR–141938, and attempted to test that evidence for PGM activity.

7. That there was deteriorated and unreadable PGM activity on the panties of both victims ... and, that, therefore, there is a reasonable probability that a useable PGM result would have been obtained in both cases, had the evidence been examined shortly after the sexual assaults occurred, or if the evidence had been properly preserved.

8. 'Proper preservation' means air drying (which on panties would occur naturally) and then freezing of the sample. Refrigeration is only slightly better than storing at room temperature.

9. Given the results I obtained, and the fact that, in both cases, the post-coital interval was less than six hours, the most likely reason for the inability to obtain useable PGM activity was the storage of the panties at room temperature over an extended period of time, that is, in the case of the [W.] assault, from March of 1984 through at least October of 1984, and in the [S.] assault, from April of 1984 to at least October of 1984.

The parties stipulate to the following additional information.

1. That the 'post-coital interval' in the case of both victims was less than six hours, i.e., the period of time between when the sexual assaults took place and the victims' underwear was collected by police at a hospital was, in the case of each victim, less than six hours.

2. That if the physical evidence taken from the victims was tested by the state for PGM activity, it was not until November, 1984, nor was it refrigerated until some time in October of 1984. The assault on [W.] took place in March of 1984 and the assault on [S.] took place in April of 1984.

3. That the defense received samples of all of the physical evidence requiring scientific analysis in this case on Thursday, November 15, 1984, and that if called to testify, Elsie Campbell, secretary to defense counsel, Eleanor Miller, would testify that the physical evidence was shipped by overnight, Federal Express to Keith Inman on Friday, November 16, 1984.

Thus, it was probable that had the state frozen the underwear a useful PGM test could have been performed by the defense. A useful test had the potential for eliminating the defendant as the perpetrator. The state has not even attempted to argue that it followed a reasonable procedure in preserving the evidence and in its response to appellant's motion to vacate admitted that it was negligent in storing the evidence. It has never suggested that it had no reason to know that freezing the samples was necessary and indeed, Paragraph 8 of the stipulation is an admission that the evi-

dence was not preserved in accordance with proper forensic standards. On that basis the appellant argues that destruction of the evidence denied him due process of law.

■ One of the state's answers to this argument is easily disposed of. The state's brief claims that the appellant's motion to dismiss was lacking in foundation because there was no showing that the semen on the victim's underwear came from the rapist. While it is true that there is no direct evidence from the victims that the rapist ejaculated during the assaults, or that the victims had not had consensual intercourse with someone else on the evenings in question, the state's argument fails for two reasons. First, the state stipulated that the semen stains were deposited on the underwear within six hours of the police taking possession of the two items. The whereabouts and activities of the victims were accounted for, at least in a general way, for the six hours preceding the attacks, and no mention was made of those activities including consensual intercourse. Second, and more compelling, the state did not raise this consideration in reply to the motion below. A fair reading of the stipulation can only lead to the conclusion that both the state and the defense were proceeding on the assumption that the semen on the underwear was the rapist's. It is too late for the state to now claim lack of foundation. *Steagald v. United States*, 451 U.S. 204, 209, 101 S.Ct. 1642, 1646, 68 L.Ed.2d 38, 43–44 (1981); *State v. McMurphy*, 291 Or. 782, 786–87, 635 P.2d 372, 375 (1981).

■ It is clear that the state had a duty to preserve the semen stains properly. In *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the United States Supreme Court stated that the constitution imposes a duty on the states to preserve evidence which might be expected to play a significant role in a suspect's defense. The Court wrote that in order to meet the standard of constitutional materiality, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be

unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422.

■ Division Two of this court has held that when the state recovers a semen sample from a victim of a sexual assault, it has the duty to take reasonable steps to preserve the evidence and make it available to the defense. When such evidence can be collected and preserved by the performance of routine procedures by state agents, failure to preserve the evidence is tantamount to prosecutorial suppression of the evidence, even though the loss of the evidence is inadvertent and not the result of bad faith. *State v. Mitchell*, 140 Ariz. 551, 683 P.2d 750 (App.1984).

In *Mitchell*, the police took a semen sample from a rape victim and performed a test on it which showed that the semen came from a man who had the same blood-type as the defendant. No PGM tests were performed on the sample because the sample had not been refrigerated and the PGM enzymes had deteriorated. The PGM test might have eliminated the defendant as the perpetrator. The court concluded that the appropriate remedy for this breach was to forbid the state to introduce evidence that the rapist and the defendant had the same blood-type. In doing so it relied on *Scales v. City Court*, 122 Ariz. 231, 594 P.2d 97 (1979), which held that it was not necessary to dismiss charges against drunk driving defendants simply because the police had destroyed breathalyzer ampoules before they could be tested by the defendants. The court held that suppression of the results of the breathalyzer tests was a sufficient remedy.

We do not believe that anything short of dismissal will suffice to remedy the denial of due process that has occurred in this case. First, here, unlike what happened in *Mitchell*, the state did not offer any scientific evidence derived from the semen samples in support of its case. Thus, there was nothing to suppress. The prosecution simply told the judge that no mention would be made of semen stains during the course of the trial as the court and counsel believed that knowledge of the existence of

this evidence might lead to speculation on the part of the jury about whether tests had been performed and what they might show.

Second, we are not convinced that Division Two was correct in relying on *Scales* in concluding that suppression was the appropriate remedy. *Scales* dealt with a scientific test that is not nearly as definitive on the issue of guilt or innocence as the PGM test is. No doubt suppression was adequate in the context in which *Scales* was decided, but that is not to say it will suffice where the evidence destroyed might have totally exonerated the defendant.

The state also intimates that the defendant's failure to request a *Willits* instruction is fatal to his case. In *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964), where the police had destroyed the remaining components of a homemade bomb which the defendant claimed had detonated accidently, our supreme court approved the giving of an instruction to the effect that the jury could infer from the state's destruction of the evidence that the "true fact" was against the state's interest. The state suggests that its destruction of evidence could have been cured by giving such an instruction here. We disagree. Our supreme court in *State v. Hannah*, 120 Ariz. 1, 583 P.2d 888 (1978), recognized that a *Willits* instruction will not cure every problem that arises as the result of a destruction of evidence. In *Hannah*, the police destroyed certain physical evidence in an arson case without testing it for fingerprints. While the court did not expressly say so, the physical evidence, certain pipes and plastic gas caps, were presumably of such a nature that the perpetrator's fingerprints would have been expected to be found thereon. The supreme court approved the action of the trial court in dismissing the case, saying:

> In the present case, we think Farhang [the defendant] has been so seriously prejudiced by the loss of evidence that he has been denied due process and that the giving of a Willits instruction will not assure him a fair trial

120 Ariz. at 2, 583 P.2d at 889.

The state argues that *Hannah* does not apply because fingerprint evidence is such that it will eliminate from suspicion everyone except the bearer of the fingerprints. The argument is doubly flawed. First, the absence of the defendant's fingerprints on the objects in *Hannah* would not have absolutely eliminated the defendant as a suspect—the defendant might have committed the crime and left no prints. Second, in the context of the case before us, it is as important to show who did not commit the crimes as to show who did. Indeed, the case now before us is a more compelling one in which to apply the *Hannah* remedy than was *Hannah* itself.

We therefore rule that when identity is an issue at trial, and the police permit the destruction of evidence that could eliminate a defendant as the perpetrator, such loss is material to the defense and is a denial of due process. Dismissal is the appropriate remedy unless the evidence against the defendant is so strong that a court can say, beyond a reasonable doubt, that the destroyed evidence would not have proved exonerating. The cases that discuss the remedy for a denial of due process of this type do not speak in quite these terms. Instead, they tend to cast the inquiry in terms of prejudice to the defendant, i.e., the denial of due process is prejudicial when the case against the defendant is weak and not prejudicial when it is strong. We believe the result is the same regardless of how the test is framed. *See People v. Nation*, 26 Cal.3d 169, 161 Cal. Rptr. 299, 604 P.2d 1051 (1980); *Crockett v. State*, 95 Nev. 859, 603 P.2d 1078 (1979); *People v. Pantino*, 106 A.D.2d 412, 482 N.Y.S.2d 334 (N.Y.App.Div.1984); *People v. Corso*, 129 Misc.2d 590, 493 N.Y.S.2d 520 (N.Y.Co.Ct.1985); *People v. Marks*, 127 Misc.2d 591, 486 N.Y.S.2d 971 (N.Y.Sup.Ct. 1985). *Compare State v. Vaster*, 99 Wash.2d 44, 659 P.2d 528 (1983).

Here we cannot say that the evidence against Escalante was so strong that the loss of the evidence was harmless beyond a reasonable doubt. Both victims originally gave descriptions of the rapist

that were not completely accurate. Neither victim had a particularly good opportunity to observe the rapist. Both mistakenly identified innocent individuals as persons they thought might be their attacker. There were some discrepancies between the descriptions the victims gave of the rapist's vehicles and the appellant's automobiles and in W.'s case, the description of the rapist's car as a hatchback is a major discrepancy. The descriptions of the gun and the green box were not particularly consistent. The prosecuting attorney conceded in final argument that there would not have been sufficient evidence to convict Escalante of the attack against W. without the evidence relating to the later similar attack on S.

It is understandable that victims who have been traumatized are not able to describe people and objects with complete accuracy. Perfect descriptions are not necessary. Flawed descriptions, however, do not strengthen the state's case.

The judgments of conviction and sentences imposed are reversed, and it is ordered returning this case to the superior court with directions to dismiss.

GREER and MEYERSON, JJ., concur.