790 P.2d 747

**STATE of Arizona, Appellant,**

v.

**Joe HERRERA–RODRIGUEZ, Appellee.**

**No. 1 CA–CR 88–1350.**

Court of Appeals of Arizona, Division 1, Department D.

Oct. 10, 1989.

Redesignated as Opinion Dec. 5, 1989.

Petition for Review Granted May 24, 1990.

Cross–Petition for Review Denied May 24, 1990.

Richard M. Romley, Maricopa County Atty. by H. Allen Gerhardt, Deputy County Atty., Phoenix, for appellant.

**50**

Dean W. Trebesch, Maricopa County Public Defender by Paul C. Klapper, Deputy Public Defender, Phoenix, for appellee.

## MEMORANDUM DECISION ■

GRANT, Chief Judge.

This is the state's appeal from the trial court's order dismissing criminal charges against the defendant. The trial court's dismissal order was predicated on *State v. Youngblood*, 153 Ariz. 50, 734 P.2d 592 (App.1986), *rev'd*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), and *State v. Escalante*, 153 Ariz. 55, 734 P.2d 597 (App. 1986). After entry of the dismissal order, the state timely appealed and the United States Supreme Court reversed *Youngblood*. *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In light of *Youngblood's* reversal, and for the reasons set forth below, the trial court's dismissal order is reversed.

## FACTS

Defendant was charged with sexual assault, kidnapping, armed burglary and aggravated assault stemming from the alleged rape of a seventy-year-old woman. The case proceeded to trial but ended in a mistrial because the jury was unable to reach a verdict.

Before the case was submitted to the jury, defendant filed a motion to dismiss because the state failed to properly preserve a cotton-swab sample from a "rape kit."[1] He relied on the Arizona and federal constitutional guarantees of due process, and the *Youngblood* and *Escalante* Arizona Court of Appeals cases. The state's criminalist testified at trial that although a cotton swab contained semen, the swab was not properly preserved and therefore test results were "not conclusive." After arguments on the motion, the trial court indicated it needed more time to consider the matter. Therefore, the motion was denied without prejudice. However, the trial court did give a *"Willits"* instruction.[2] After about five hours of deliberation, the jury informed the court that it could not reach a unanimous verdict, and a mistrial was declared.

Prior to retrial, an evidentiary hearing was held on the motion to dismiss. The state presented testimony from its criminalist that even if the cotton swab had been properly preserved (air-dried), the specimen may not have been of sufficient quantity to enable successful testing. The state also presented testimony that hair comparisons were made and that hairs taken from the victim's clothing and bed sheet were similar to known pubic hairs from the defendant. The criminalist also testified that animal hairs recovered from the defendant's clothing were similar to animal hairs found on the victim's clothing, bed sheets and pillow cases. The state did not present this evidence at defendant's trial because it was unaware the comparison had been made.

The state argued that hospital personnel, not police, failed to properly preserve the cotton swab. Defendant countered that hospital personnel were acting as agents of the police and that the failure to air-dry the cotton swab should result in dismissal. Defendant contended the state's evidence was weak and identification was the crucial issue. Therefore, he argued, *Youngblood* and *Escalante* mandated dismissal. None of the parties argued or considered bad faith on the part of police, as the United States Supreme Court had not yet issued its opinion in *Arizona v. Youngblood*.

After the hearing, the trial court, based on *State v. Youngblood* and *State v. Escalante*, stated that it could not conclude that the evidence of defendant's guilt was so strong that, beyond a reasonable doubt, the destroyed evidence would not have proved exonerating. Consequently, the court dismissed the indictment.

---

1. A "rape kit" is a sex crimes evidence tool used by police to collect various evidence for testing, including semen or sperm specimens from rape victims.

2. *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964)

## DISCUSSION

### Arizona v. Youngblood

■ The United States Supreme Court made it clear the federal Constitution does not require dismissal of a criminal case where police fail to preserve material evidence, absent a showing of "bad faith." In reversing *State v. Youngblood,* the Supreme Court announced that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289 (1988). In reaching this result, the Court noted that:

> requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly required it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

*Id.* Thus, the due process analysis espoused in *State v. Youngblood* and relied on by the trial court in dismissing the case against defendant is no longer valid.

### Article 2, § 4 of the Arizona Constitution

■ The sole argument presented in the defendant's answering brief is that the Arizona Constitution provides greater safeguards than the federal Constitution and therefore the trial court's order of dismissal should be affirmed. Defendant does not indicate which portion of the Arizona Constitution he relies on. Nor does he cite any authority holding that the Arizona Constitution requires dismissal of a case where police fail to preserve evidence absent bad faith.[3]

In *Youngblood,* the United States Supreme Court based its holding on the due process clause of the fourteenth amendment. The analogous provision in the Arizona Constitution is article 2, § 4, which states that "[n]o person shall be deprived of life, liberty, or property without due process of law." This wording is nearly identical to the fourteenth amendment, which provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law...." The similarity of language suggests a similar standard. *Cf.* Feldman & Abney, *The Double Security of Federalism: Protecting Individual Liberty Under the Arizona Constitution,* 20 Ariz.St.L.J. 115, 123–24 (1988). There, the authors suggest that in those instances where the "Arizona provision contains broader and more protective language," the specific Arizona constitutional provision may indeed provide greater protection than its federal constitutional counterpart. *Id.* at 124. However, the authors do not contend that the due process clause is one such provision.

The Arizona Supreme Court has relied on textual differences between the state constitution and its federal counterpart in formulating decisions finding more security in the Arizona Constitution. *See, e.g., State v. Ault,* 150 Ariz. 459, 466, 724 P.2d 545, 552 (1986) (refusal to extend inevitable discovery doctrine into defendant's home, based on art. 2, § 8 of Arizona Constitution, which more explicitly protects sanctity of the home than its federal counterpart); *State v. Bolt,* 142 Ariz. 260, 264–65, 689 P.2d 519, 523–24 (1984) (in absence of exigent circumstances, warrantless searches go beyond protections of art. 2, § 8 of Arizona Constitution, despite rulings of U.S. Supreme Court under counterpart provisions of U.S. Constitution); *State v. Martin,* 139 Ariz. 466, 475, 679 P.2d 489, 498 (1984) (refusal to allow warrantless search,

---

3. In *State v. Gerhardt,* 161 Ariz. 410, 778 P.2d 1306, 1308–09 (1989), the court suggested that if there is a clear showing of substantial prejudice, dismissal may be required even absent a showing of bad faith if the loss of evidence would result in a fundamentally unfair trial. As we pointed out in this case, the state's criminalist testified that the quantity of semen collected

may have been insufficient to enable testing even if it had been properly preserved. We made clear in *Gerhardt* that "a showing of prejudice dependant on speculation as to the potentially exculpatory value of lost evidence is insufficient to justify dismissal." *Id.* 778 P.2d at 1309. We find no substantial prejudice in the instant case.

based on constitutional sanctity of the home).

As noted, however, the wording of the due process clauses of both constitutions is nearly identical. This suggests that the state due process clause is coterminous with the federal due process clause, a notion implicit in several Arizona Supreme Court cases. *See, e.g., State v. Schreiber*, 115 Ariz. 555, 558–59, 566 P.2d 1031, 1034–35 (1977); *State v. Fowler*, 101 Ariz. 561, 564, 422 P.2d 125, 128 (1967); *State v. Cota*, 99 Ariz. 233, 236–37, 408 P.2d 23, 26 (1965). Any further extension of our own constitution to limit or circumscribe the standards set forth in *Arizona v. Youngblood* is a matter left for the Arizona Supreme Court. *See State v. Calabrese*, 157 Ariz. 189, 191, 755 P.2d 1177, 1179 (App. 1988) (whether art. 2, § 8 of the Arizona Constitution provides more protection than the federal Constitution's counterpart is a matter for the Arizona Supreme Court).

*Prejudice to Defendant*

In his concurring opinion in *Arizona v. Youngblood*, Justice Stevens relied heavily on the fact that the jury was given a *Willits* instruction. Based on this instruction, he noted that any "uncertainty as to what the evidence might have proved was turned to the defendant's advantage." *Arizona v. Youngblood*, 488 U.S. at 60, 109 S.Ct. at 338, 102 L.Ed.2d at 290 (Stevens, J., concurring). In *Arizona v. Youngblood*, the defendant was convicted by the jury. Therefore, Justice Stevens noted:

> In declining defense counsel's and the court's invitations to draw the permissive inference, the jurors in effect indicated that, in their view, the other evidence at trial was so overwhelming that it was highly improbable that the lost evidence was exculpatory.... [I]n a case involving a closer question as to guilt or innocence, the jurors would have been more ready to infer that the lost evidence was exculpatory.

*Id.* at 60, 109 S.Ct. at 338, 102 L.Ed.2d at 291 (Stevens, J., concurring). This suggests that the *Willits* instruction is an adequate remedy in cases where, absent bad faith, the state fails to preserve material evidence.

■ In this case, the question as to guilt or innocence may have been a "closer question," and some jurors indeed may have inferred that the lost evidence was exculpatory. Although "there may well be cases in which the defendant is unable to prove that the state acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair," *id.* at 61, 109 S.Ct. at 339, 102 L.Ed.2d at 291 (Stevens, J., concurring); *see also State v. Gerhardt*, 778 P.2d at 1308–09, the present case is not such a case.

For all of the above reasons, we find that the trial court's order of dismissal must be reversed and the charges against defendant reinstated.

CLABORNE, P.J., and BROOKS, J., concur.