683 P.2d 750

The STATE of Arizona, Appellee,

v.

Gary Arland MITCHELL, Appellant.

Nos. 2 CA–CR 2774, 2 CA–CR 2979–2.

Court of Appeals of Arizona, Division 2.

Jan. 19, 1984.

On Motion for Reconsideration March 13, 1984.

Review Denied June 5, 1984.

Robert K. Corbin, Atty. Gen. by Bruce M. Ferg, Asst. Atty. Gen., Tucson, for appellee.

Frederic J. Dardis, Pima County Public Defender by Frank P. Leto, Asst. Public Defender, Tucson, for appellant.

## OPINION

HOWARD, Judge.

Appellant was indicted on three counts of sexual assault in violation of A.R.S. § 13–1406 and one count of attempted sexual assault in violation of A.R.S. §§ 13–1001 and 13–1406. All of the counts involved different victims and allegations of prior conviction were filed for enhancement purposes pursuant to A.R.S. § 13–604. Count three, attempted sexual assault, was later dismissed by the state and appellant was tried separately on counts one and two. He was found guilty by a jury of count one and the jury also found the allegations of dangerousness and prior conviction to be true. He was found not guilty by a separate jury in a separate trial on count two. He thereafter pled guilty to count four.

The trial court, in sentencing defendant on count one noted, inter alia, that the crime was committed within one month after appellant's release on parole. It sentenced him to 21 years' imprisonment to commence upon the completion of the sentence he was serving in Jackson, Mississippi.

Count one was alleged as a prior conviction in count four to which appellant pled guilty. He was sentenced on count four to 28 years' imprisonment to run concurrently with the sentence on count one. This appeal concerns both counts one and four.

On July 2, 1981, the victim came home at 11:30 p.m. and went to sleep. Her roommate was at work. She was awakened shortly thereafter by the doorbell and upon going to the door she saw, through the peephole, a black man, the defendant. She did not open the door at first but asked him who he was. He said he was Gary and gave her a last name which she could not remember. She asked him if he was a friend of her roommate and he said that he was. She told him her roommate was not there and when he asked when she was going to return, she told him that her roommate would be back about 1:30 a.m. The defendant then asked if he could leave a note. The victim assented, opened the door and let him in the house. Although there was no light in the living room, the lights were on in the kitchen and both bedrooms.

She gave the defendant a piece of paper and a pen and he went into the kitchen and started writing. She went back to her bedroom to put on a robe but when she turned around the defendant was there with a knife in his hands. He told her that if she screamed or did anything wrong he would kill her. She begged him not to hurt her and he put down the knife and raped her. He then had her get into the shower and clean herself while he went to get the pen and paper she had given him. After she got out of the shower, she put on a robe and sat down on the bed and talked with him. He apologized to her but also threatened her if she told anybody what happened.

She had been calling him Gary all of this time and he said, "You don't think my name is really Gary, do you? You don't think I'd actually tell you my real name?"

He then left the house but cleaned off the doorknob with his handkerchief before departing. All of this took about fifteen minutes and the victim clearly saw appellant's face in the bedroom light. She also noticed that the defendant's left ear was pierced and that he was wearing an earring. Two or three minutes after the defendant left, she called her roommate at work who in turn hailed a police unit. When the police arrived the victim was in a corner of the living room, hysterical and with a large knife by her side. A vaginal swab was utilized to collect any semen, and

a slide was made and it was sent to Edward Heller, a criminalist at the Tucson Police Department Crime Laboratory, who received it on July 14.

Starting the day after the rape, the victim was shown one physical lineup and three photographic lineups. She did not see the defendant in the first three lineups, one of which was the physical lineup. In fact, he was not in any of these. During the fourth lineup, she immediately picked out his photograph as soon as she saw it and told the police that he was definitely her assailant. Appellant was arrested on September 27, 1981, in Tucson, and at the tiral the victim unhesitatingly and positively identified the defendant as her attacker.

Heller's examination of the slides revealed the presence of sperm. In November 1981, Heller took a blood and saliva sample from both the defendant and the victim for comparison with the semen sample. His tests showed that the defendant was a group O secretor, the victim a group B secretor and that the semen sample came from a group O secretor. He also explained that secretors secrete the same bloodtype from their blood into their body fluids and that some people are non-secretors. Heller also testified that the largest segment of the black population, approximately 40 per cent, were type O secretors.

Heller further testified that it is possible to analyze semen by breaking it down into its PGM enzyme types. About 58 per cent of the population has a PGM 1 type; PGM 2–1 is found in approximately 36 per cent of the population and PGM 2, approximately 6 per cent. In July 1981 his lab did not have the capability of performing the PGM analysis, and if the semen is not refrigerated the enzymes deteriorate within a month. If it has been refrigerated, the enzymes would probably last three to six months. Even if he had a fresh sample of semen and was able to do a PGM analysis, Heller testified that doing enzyme typing of secretions of semen is very difficult and that if you get readable, interpretable material 40 per cent of the time you would be doing fairly well. Utilization of bloodtype, and the PGM enzymes, can eliminate a person as being the one who secreted the semen.

Appellant did not testify but presented a female witness who said that she gave appellant an earring and that she had never seen him with the type of earring described by the victim. Appellant also called the victim's roommate who testified that on July 2, 1981, two blacks arrived in a van and talked to her while she was washing her car and that she was later shown a three-man lineup and that one of the persons in the lineup looked like one of the men who was talking to her.

On appeal appellant contends that the trial court erred in (1) failing to suppress his in-court identification by the victim because the pretrial identification procedures were unduly suggestive; (2) failing to dismiss the indictment on count one because of the loss or destruction of the photographic lineups, and (3) failing to dismiss count one because of the negligent destruction of possible exculpatory evidence. As for count four, his only argument is that since count one has to be dismissed because of the foregoing errors, he will have to be resentenced on count four. We affirm.

We first discuss the loss of the first two photographic lineups. The first lineup was shown to the victim prior to the time that appellant had even been arrested. Neither of the lineups contained a photograph of appellant. Had the victim selected appellant's picture from out of a photographic lineup, then the materiality of the other photos in the lineup is evident. One cannot show that the lineup was unduly suggestive if one does not have the rest of the pictures in the lineup. However, when the victim has failed to identify anyone in the lineup as being the assailant, then the existence of a photo lineup is immaterial. See *State v. Nebeker*, 657 P.2d 1359 (Utah 1983).

As far as the undue suggestiveness of the photographic lineup in which she did

identify appellant, there is no evidence to substantiate this contention. Although there was a mug shot number and a date on the photographs, the names of the persons were covered and not seen by the victim. No argument can be made that the dates on the photographs made them unduly suggestive.

The testing of the semen specimen taken from the victim involves a more serious problem. The slide did not reach Heller until July 14, 1981. However, he did not have the capacity to perform the PGM enzyme grouping until January 1982. The enzymes deteriorate rapidly and can be found in the semen up to six months later if the semen is refrigerated. Heller testified that even though there was only a possibility that the enzymes would still be there in January 1982, he would have used the new equipment to test the specimen in January 1982 if it had been refrigerated.

By the time Heller received a request to conduct a bloodtyping analysis, in November 1981, the PGM enzymes had already deteriorated in the specimen and no PGM analysis could have been made.

The facts here raise two questions. Did due process principles as set out in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), require the police to refrigerate the semen slide and if so, whether the failure to do so mandates a reversal or dismissal of count one. We believe that the first question is answered by *Scales v. City Court of City of Mesa*, 122 Ariz. 231, 594 P.2d 97 (1979). There the court held that the test ampoule used in the Breathalyzer must be retained so that it can be tested by defense counsel.

So too in the case of semen samples. It has been held that if the state recovers the semen sample of one who is the victim of a sexual assault, it has the duty to take reasonable steps to preserve that evidence and to make it available for the defense. In *People v. Nation*, 26 Cal.3d 169, 161 Cal.Rptr. 299, 604 P.2d 1051 (1980), contrary to the facts in our case, the state made no effort at all to test a semen sample. The court said:

"We first consider whether the prosecution's failure to adequately preserve the sample of the attempted rapist's semen deprived the defendant of a fair trial. It is clear that the Constitution does not require the prosecution to make a complete and detailed accounting to the defendant of all police investigatory work on a case. (citation omitted) Yet it is well established that the suppression by the state of evidence favorable to an accused, after a request therefor, violates due process, irrespective of the good faith of the prosecution. (citation omitted) This court has recognized the prosecutor's duty to disclose such material evidence favorable to the accused even in the absence of a request from the defense. (citation omitted) In *People v. Hitch* (1974) 12 Cal.3d 641, 650, 117 Cal. Rptr. 9, 527 P.2d 361, we held that the obligation to disclose the existence of material evidence places on the state a correlative duty to preserve such evidence even without a request therefor, and directed that in the future law enforcement agencies take reasonable measures to insure its adequate preservation." 604 P.2d at 1054.

The court then went on to describe the blood typing and PGM enzyme test and how such analysis might have exonerated the accused. Reversal was not required in *Nation*, however, because the seman sample had been delivered by the state to the defense in response to a pretrial discovery request and the deterioration of the sample was not caused by the state's inaction but by the failure of the defense to do anything with the sample while it had it.

■ We agree with the California court and hold that the law enforcement officers have a duty to preserve the semen samples in a rape case, including refrigerating them.

■ The failure of the state to preserve a semen sample did not merit dismissal of count one but only the suppression of any blood-grouping evidence. See *Scales v. City Court of City of Mesa*, supra. The question then is whether the

admission into evidence of the results of the blood-grouping test requires reversal. We hold that it does not because the error here is harmless beyond a reasonable doubt. In *State v. Devaney,* 18 Ariz.App. 98, 500 P.2d 629 (1972) we set forth the three questions that must be satisfactorily answered before we may apply the harmless error doctrine of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). They are:

"(1) When the facts are weighed, is it clear beyond a reasonable doubt that the defendant is guilty as charged? (2) Did the error contribute to the guilty verdict, and if so, to what degree? (3) If the Chapman-Harrington test is satisfied do public policy reasons require reversal?" 18 Ariz.App. at 100, 500 P.2d 629.

■ There is no doubt here that the first two questions should be answered in favor of finding the error to be harmless since the facts in this case are overwhelmingly against the defendant. The victim had a clear view of him for fifteen minutes in a lighted room, he called himself Gary and he had a pierced left ear in which he wore an earring. The victim identified his photograph immediately upon seeing it for the first time. We can say, beyond a reasonable doubt, that had the evidence of a blood-grouping not been introduced into evidence, the jury still would have found the defendant guilty. In the case of *State v. Gray,* 292 N.C. 270, 233 S.E.2d 905 (1977) the court said:

"We believe the better view to be that results of blood grouping tests are generally admissible. While their positive probative value is somewhat tenuous, we see little, if any, ascertainable prejudice which could arise from their admission.
* * *

... In view of the weight of other evidence against defendant we cannot perceive how evidence of the blood grouping results could have affected the outcome of the trial." 233 S.E.2d at 914.

We agree with the North Carolina court as to the prejudice or probative value of the blood grouping test. This is especially so here since all it showed was that appellant was in the greatest segment, 40 per cent, of the black males who could have committed the crime.

Turning to the last question, we do not perceive any public policy reasons requiring reversal in this case.

Affirmed.

BIRDSALL, C.J., and HATHAWAY, J., concur.

## ON MOTION FOR RECONSIDERATION

HOWARD, Judge.

In his motion for reconsideration the defendant correctly states that we inadvertently omitted to discuss two further issues which he presented in his appeal. Appellant contends that he was denied a fair trial because the trial court failed to instruct the jury with a proper "Willits" instruction and because of improper remarks of the prosecutor in closing argument. We do not agree.

■ Over appellant's objection the trial court gave the following instruction relative to lost or destroyed evidence:

"If you find that the State has lost, destroyed or failed to preserve evidence whose contents or quality are material to the issues in this case, *then you should weigh the explanation, if any, given for the loss or present unavailability of the evidence. If you find that any such explanation is inadequate then you may draw an inference unfavorable to the State which in itself may create a reasonable doubt as to the defendant's guilt.*

However, the state is not compelled to call any particular witness or to make any particular test so long as there is fairly presented the material evidence bearing upon the charge for which the defendant is on trial and such evidence establishes the guilt of the defendant

beyond a reasonable doubt." (Emphasis added)

In lieu of the court's instruction, appellant requested the trial court to give the instruction found in *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964), which states:

"If you find that the plaintiff, the State of Arizona, has destroyed, caused to be destroyed, or allowed to be destroyed any evidence whose contents or quality are an issue, you may infer that the true fact is against their interests." 96 Ariz. at 187, 393 P.2d 274.

In objecting to the trial court's instruction and in requesting the instruction upon *Willits* the defense attorney stated:

"I would be requesting specifically that instruction in lieu of the court's instruction, in lieu of my instruction. Mine tends to clean that up and explain what the true fact means. There's nothing in Willis [sic] about you have to consider why the evidence happened to be destroyed. I have the opinion right here."

The defendant contends that if the state loses or destroys evidence he is entitled to the unfavorable inference regardless of any explanation given by the state for the loss. We do not agree. The language in *Willits* itself demonstrates the correctness of the court's instruction:

"The jury could accept the explanation that the dynamite was dangerous to keep and still believe that this was not an adequate reason for its destruction in the light of its relative importance to the outcome of the case. Had the instruction been given, the jury would have been in the position of weighing the explanation and, if they believed it was not adequate, an inference unfavorable to the prosecution could have been drawn. *This in itself could create a reasonable doubt as to the defendant's guilt.*" (Emphasis in original) 96 Ariz. at 191, 393 P.2d 274.

In the final argument the prosecutor said:

"Now, to put that in maybe a little simpler way, if you're satisfied of his guilt beyond a reasonable doubt with or without that evidence, then you can go ahead and find him guilty whether it exists or not, and I would submit to you that even if the crime lab was able to analyze those enzymes it would've come back being the same enzyme group that he is."

Defense counsel made a general objection to the foregoing argument which was overruled by the court and the prosecutor continued:

"Now, as I said there is no evidence one way or the other. I am submitting to you, giving you an inference that that would be the case because he has been identified as the man that left that semen in Cheryl Morrison. I submit to you that it would be the same result as the blood test, you know, the blood was analyzed and it came back to be his and if the enzymes are analyzed I submit to you that would come back to be his, too, because he's the one that raped her."

■ Appellant contends that the prosecutor's argument was an improper comment on matters not entered into evidence because there was no evidence as to what the result of the semen tests were since the evidence had been destroyed. We do not agree. It seems clear that the prosecutor in this case was not commenting upon matters not introduced into evidence. He was not saying that the enzyme test in fact showed appellant to be the assailant. He was merely asking the jury to draw an inference based upon all the rest of the evidence in the case, and attempting to counter the defendant's argument that because of the loss or destruction of the evidence, it could be inferred that the results would have shown that the defendant was not the rapist.

■ After the jury had been instructed and retired for deliberation, defendant moved for a mistrial because of the prosecutor's remarks about the jury putting itself in the place of the victim if an acquittal occurred because of lost evidence. This objection was not made until the jury had retired. It was the duty of counsel to

make his objections at the earliest opportunity in order that the court may correct possible errors by appropriate instructions, thereby avoiding a mistrial. *State v. Williams,* 107 Ariz. 262, 485 P.2d 832 (1971); *State v. Boozer,* 80 Ariz. 8, 291 P.2d 786 (1955).

The prosecutor's argument was as follows:

"His big complaint in this area is how would you feel if you were Gary Mitchell and you're on trial for a case like this and the enzymes were lost. I would just like to give you the converse of that and say how would you feel if you were Cheryl Morrison and you picked out the man that raped you and you said this is him, there is no doubt in my mind about that, and the jury found the guy not guilty just because the police didn't refrigerate those enzymes? How would that feel? That would be a miscarriage of justice if that were the case, if Cheryl Morrison had to find out this man was found not guilty just because the police had not refrigerated those enzymes."

A review of the defendant's closing argument reveals that the prosecutor's remarks were in response to such arguments as follows:

"How would you like to be sitting at the defense table charged with a crime, there's no physical evidence. You've got an eye witness. That's the sum total of the evidence. You can't really cross-examine them. How would you like to be sitting there thinking the police could have put something in a plastic bag and saved it for a couple of months and that could prove your innocence? You can't get at it. What would you be feeling right now?"

Under such circumstances the remarks were retaliatory and the trial court did not err in refusing to grant a motion for mistrial.

Finally, defendant contends that the prosecutor was guilty of misconduct in arguing that the victim's care in not identifying anyone in the early, lost photo lineups enhanced the credibility of the identification she eventually did make. We do not agree. The argument was a permissible interpretation of the evidence.

For the reasons set forth in our previous opinion and set forth here in the supplemental opinion, the convictions and sentences are affirmed and the motion for reconsideration is denied.

BIRDSALL, C.J., and HATHAWAY, J., concur.