734 P.2d 592

**The STATE of Arizona, Appellee,**

v.

**Larry YOUNGBLOOD, Appellant.**

**Nos. 2 CA–CR 3979, 2 CA–CR 4364–2.**

Court of Appeals of Arizona,
Division 2, Department B.

Oct. 2, 1986.

Review Denied March 27, 1987.

Robert K. Corbin, Atty. Gen., by William J. Schafer III, and Gerald R. Grant, Phoenix, for appellee.

Daniel F. Davis, Tucson, for appellant.

## OPINION

LACAGNINA, Judge.

. Larry Youngblood appeals his jury convictions for molestation of a child, sexual assault and kidnapping, with a prior conviction, and the court's imposition of presumptive concurrent 10.5–year prison terms. His defenses to the charges were misidentification and nonpresence. Youngblood argues that the convictions should be reversed and the case against him dismissed because the state failed to adequately preserve certain physical evidence and disposed of other evidence in violation of his due process rights. We agree with Youngblood's arguments and reverse.

### THE INCIDENT

David, the ten-year-old victim, had left a church service he was attending with his mother around 9:30 p.m. on the night of October 29, 1983, and had gone to a nearby carnival where he was approached by a middle-aged black man of medium height and weight. David, described as a very observant youngster, testified that his assailant was a black man named Damian or Carl who had greasy grey hair, facial hair, no facial scars, and whose right eye, to David's best recollection, was almost completely white. His assailant wore brown leather or plastic loafers and drove a white,

medium-sized, two-door sedan with a passenger door that did not work. The evidence established that Larry Youngblood is a thirty-year old black male who has dry black hair, a scar on his forehead and a bad left eye. He wears cloth-laced shoes and walks with a noticeable limp due to a foot injury received in an automobile accident when he was a child. He always wears glasses in public.

After attempting to persuade David to get into the car, the assailant grabbed him, threw him into the car and held him by his hair, continually pushing his head down on the floorboard, while driving away. Country music was playing on the radio. At some point, the assailant stopped the car near a ravine or wash and fondled and molested David. He then took David to an unidentified, sparsley furnished house where he sodomized him four times. He threatened to kill David if David told anyone about the incident. He also told David during the acts of anal intercourse that David was "too small," that the assailant had done this with his nephew so many times that his nephew's anus "was already stretched out." Later, he used a jumper cable to start the car and returned David to the carnival. The episode lasted about an hour and a half.

### THE SAMPLES

David was taken to Kino Hospital. Hospital personnel used a sexual assault kit to preserve evidence of the molestation. The kit included a tube for collecting a blood sample, a paper to collect a saliva sample, microscopic slides used to make smears (for female victims) and a set of swabs used to collect evidence. In this case, rectal and throat smears were made, and samples of the victim's blood and saliva were taken. The state's criminalist found evidence of semen present on the rectal smear. He did not attempt to quantify the amount of semen on the swab until a year after the assault had occurred. At that point he found no blood group substances on the swabs.

In addition, David's clothing was taken as evidence. The clothing was never re- frigerated, and no testing was done until 15 months after the assault. Semen was found on the clothing, but no blood group substances were found on the underwear or the tee shirt stains. Samples of David's hair were taken to compare with any evidence found in Youngblood's car.

### THE CAR

David described the assailant's car as a medium-sized, two-door sedan with a trashy interior and a noisy muffler. He testified that the car started with an ordinary ignition key. He also testified that there were blankets or sheets on the seats of the car but that he was not able to see them because the car was dark. The car radio was playing country music. The assailant told David the right passenger door did not work. About a month following the assault, David was brought to the police station to look at two blankets which he was told were taken from the assailant's car. Without touching them, he identified the blankets as those which were in the car.

Six weeks following the assault, the police seized Larry Youngblood's 1964 white, four-door Chrysler Imperial from the home of Alice Whigham, his former girlfriend, took it from her back yard where it was inside a chained gate, towed it to the station, took pictures of the car and dusted it for fingerprints. It was also examined for clothing and hair fibers. Because Youngblood had not transferred title to his name when he acquired the car, the police disposed of the vehicle without notice to Youngblood or defense counsel. Prior to this time, they did not determine whether the radio worked, if the ignition switch worked with a key, what channel the radio was tuned to, if the muffler was noisy, or indeed whether the car was running at all.

Youngblood and others testified that his car was not running at the time of the incident because of electrical problems and because it needed other repairs. He further testified that he had removed the battery from his car to put in Alice Whigham's car. The car ran quietly when it was functioning and did not start with a key but

with a screwdriver. The radio had not worked at all since he owned the car. The examination of the car failed to reveal any fingerprints, hair or clothing fibers from David; the only fingerprints were those of Youngblood.

### THE IDENTIFICATION

Nine days after the assault, a police detective came to David's school, took a taped statement from him, told him they had arrested the man who raped him, and asked him to pick the assailant out of a photographic lineup. Three of the photographs had the left eye whited out, and three had the right eye whited out. David's optometrist testified at trial that David had an astigmatism and "was instructed to wear glasses whenever he was in school [or] doing close work, [or watching] T.V." He was not wearing glasses the night of the incident nor when he first viewed the photographic lineup. After looking at the pictures by holding them very close to his face, David picked Youngblood as his assailant, saying he was "pretty sure." Later, David identified another man in the lineup as the possible assailant.

### THE ALIBI

Alice Whigham testified that on the night of the assault she had been at her mother's house until 9:30 p.m. preparing for her sister's birthday. When she returned home, the 10:00 o'clock news was coming on the television, and Youngblood was asleep on the living room sofa. Her house is a 30 to 45 minute drive from the place where David was abducted. The police interviewed Whigham four or five weeks after the incident. They woke her up at 4:00 a.m. and began asking her if she knew where Larry had been "around Halloween." She responded that he was not with her that night, but that he was living there at the time. When Whigham later learned the actual date of the incident, she made several calls to the police department and defense counsel to tell them that Youngblood had been with her that night. Those calls were never returned. Young-

blood testified that he was living with Alice at the time of the incident.

### SANCTIONS FOR DESTRUCTION OF EVIDENCE

We have previously held that law enforcement officers have a duty to preserve semen samples in a sexual assault case, including a duty to refrigerate them. *State v. Mitchell*, 140 Ariz. 551, 683 P.2d 750 (App.1984). The United States Supreme Court has held that the due process clause of the fourteenth amendment requires "that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 484, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413, 419 (1984). This imposes a "constitutional duty on the prosecution to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *Id.* Such evidence is considered material if its exculpatory value was apparent before the evidence was destroyed and is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 488, 104 S.Ct. at 2534, 81 L.Ed.2d at 422, citing *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

However, in *Mitchell* we concluded that the failure of the state to preserve the sample did not merit dismissal but only suppression of any bloodgrouping evidence, citing *Scales v. City Court of City of Mesa*, 122 Ariz. 231, 594 P.2d 97 (1979). We further held in *Mitchell* that the improper admission into evidence of the bloodgrouping test results was harmless error beyond a reasonable doubt because of the overwhelming evidence against the defendant.

Since our decision in *Mitchell*, we have again considered what circumstances would warrant dismissal of a case for destruction of evidence. In *State v. Fierson*, 146 Ariz. 287, 705 P.2d 1338 (App.1985), we stated:

There is a difference between the destruction of physical evidence used in the commission of a crime and the destruction of statements by witnesses who are

available for examination and cross-examination. The loss of physical evidence as in *State v. Hannah*, 120 Ariz. 1, 583 P.2d 888 (1978), with a clear showing of prejudice requires dismissal. . . .

146 Ariz. at 289, 705 P.2d at 1339. In *Fierson*, we found the accused had access to the evidence in other forms and was able to cross-examine the witnesses concerning the evidence. Therefore, we concluded that Fierson suffered no prejudice. To the same effect was the Supreme Court's conclusion in *Trombetta* that the defendants were not "without alternative means of demonstrating their innocence." 104 S.Ct. at 2535. In *Mitchell*, we held that the state's failure to preserve the semen sample did not require dismissal because the results of the blood grouping test in that case could not have affected the verdict beyond a reasonable doubt. The results would not have shown that defendant was not the rapist. *See also State v. Hauss*, 142 Ariz. 159, 166, 688 P.2d 1051, 1058 (App.1984).

Our decision in *State v. Maldonado*, 138 Ariz. 475, 675 P.2d 735 (App.1983), and the supreme court decision in *State v. Perez*, 141 Ariz. 459, 687 P.2d 1214 (1984), also present fact situations which differ from the present case. In *Maldonado*, the loss of the victim's underpants prior to testing was ruled not prejudicial where the victim denied ejaculation and there was also no evidence of deterioration of the sample. In *Perez*, the lost evidence was a video tape of the robbery itself which the victim viewed prior to the photographic lineup. There was eyewitness testimony in that case, along with other photographic evidence of the robbery. As we stated in *State v. Fierson, supra*, the courts distinguish between physical evidence which is destroyed and the destruction of evidence for which witnesses are available for cross-examination. Additionally, the accused in *Perez* had other evidence available from which to prove his innocence.

Other jurisdictions also require a specific showing of prejudice: the defendant must "establish a reasonable probability that the evidence could have been of assistance to the defense." *People v. Janke*, 720 P.2d 613, 615 (Colo.App.1986). In *Janke*, the defendant argued that evidence consisting of semen on the victim's carseat was destroyed without testing and that destruction required dismissal. The court disagreed and concluded:

> Although no blood grouping test was performed on the specimen found on the carseat, a blood grouping test was performed on specimens taken from the victim's jeans, underwear, and vaginal swabs. *Those test results did not exclude defendant as a possible source of the semen; rather it identified a person of his blood type as being a possible source.* In view of these results, defendant has failed to show a reasonable possibility of assistance to his case from the specimen on the carseat.

*Id.* (emphasis added).

In *People v. Epps*, 182 Cal.App.3d 1102, 227 Cal.Rptr. 625, 628 (Cal.App. 5 Dist. 1986), where defendant was charged with murder and the "physical evidence and eyewitness testimony overwhelmingly established appellant as the perpetrator of this brutal and senseless murder," the court concluded there was no due process violation from the state's failure to perform a particular test:

> [T]he evidence was in fact analyzed, the results were helpful to appellant, and it is quite apparent that the trial court gave at least as much weight to the defense witnesses' extrapolation of the results of analysis as would likely have been possible given an adequate sample for retesting. *Quite simply put, appellant got as much mileage out of the evidence . . . as he could reasonably have expected, no matter how many experts analyzed the evidence.*

227 Cal.Rptr at 634 (emphasis added).

In this case, the samples were not preserved. The tests were never performed. We cannot say beyond a reasonable doubt that had the samples been preserved and the tests performed and the results introduced into evidence, the jury still would have convicted Youngblood.

Both criminalists who testified in this case agreed that the P–30 test or the acid phosphate test might have exonerated Youngblood. The testing is done for two reasons: it verifies that sexual contact has occurred and also attempts to narrow the number or to exclude certain persons as suspects. The initial testing (ABO typing) on the rectal swab for blood group substances (found in certain persons who secrete the substances into their body fluids) showed that the criminalist was unable to find any blood group types. Both experts indicated that two equally possible alternatives would account for this. One was that the semen donor was a nonsecreter. That alternative would have eliminated Youngblood as the semen donor since he was analyzed and found to be an A secreter. The second alternative was at best neutral in relation to Youngblood's defense. It was that the secreter was of unknown blood type, because the sample was insufficient to determine the type. If the P–30 or the acid phosphate test had been performed, and the results showed there was a sufficient quantity of semen, then Youngblood could have been excluded. Even if the test results did not completely exonerate Youngblood, the criminalists agreed that they would have "considerably diminished the population of possible semen donors."

The deterioration of the semen sample was caused by the state's inaction in two areas: 1) the inability to quantitatively test the rectal swab and 2) the failure to properly preserve the "better sample," the stains taken from the victim's clothing. As the evidence showed, the samples taken from the clothing would have contained more semen than the rectal swab because of "natural drainage and leakage." The testimony also showed that since samples on clothing dry more quickly, there would be less chance for deterioration because of moisture. Additionally, there would be less contamination with either vaginal fluid or material from the rectum. The state's criminalist failed to refrigerate or freeze the clothing and failed to test the clothing for 15 months following the assault. When he ran the P–30 test, a quantitative test, he found the sample to be very small. He was also unable to determine any blood groupings.

There is no doubt that prejudice to Youngblood occurred as the result of the state's inability to properly preserve the evidence. We find that this is a case that requires dismissal and agree with the ruling of Division One of this court in *State v. Escalante*, 153 Ariz. 55, 734 P.2d 597 (1986), where the court stated:

We therefore rule that when identity is an issue at trial and the police permit the destruction of evidence that could eliminate a defendant as the perpetrator, such loss is material to the defense and is a denial of due process. Dismissal is the appropriate remedy unless the evidence against the defendant is so strong that a court can say beyond a reasonable doubt that the destroyed evidence would not have proved exonerating.

153 Ariz. at 61, 734 P.2d at 603.

This is not a case where the samples were available for defendant's examination, *see State v. Wiley*, 144 Ariz. 525, 538, 698 P.2d 1244, 1257 (1985), and the defense "fails in a timely fashion to avail itself of the evidence [such that] subsequent deterioration of the evidence attributable to the passage of time cannot be said as a matter of law to be attributable to the prosecution." *People v. Newsome*, 136 Cal.App.3d 992, 1000, 186 Cal.Rptr. 676, 684 (1982). It is a case where "tests were not made which could have been made and ... it cannot now be determined whether exculpatory evidence would have been developed." *See State v. Hannah*, 120 Ariz. 1, 2, 583 P.2d 888, 889 (1978).

In holding today that the state's action in failing to preserve the evidence requires dismissal, we do not imply any bad faith on the part of the state. Rather, we acknowledge the right of an accused to a fair trial: the dismissal is necessary in order to avoid an unfair trial, not as punishment for any inaction by the state. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963). As the California Supreme Court stated in *People v. Nation,*

26 Cal.3d 169, 176, 604 P.2d 1051, 1055, 161 Cal.Rptr. 299, 303 (1980):

Thus, an analysis of the semen sample in the present case might have not only impeached the credibility of the prosecution's witnesses [citations omitted], but also might have completely exonerated the defendant. Whether or not the police deem the crime sufficiently important to warrant such an identification analysis, they cannot make this decision for the defendant. Accordingly, when a woman has been the victim of an attempted or actual rape and the police recover a semen sample of the assailant, the authorities must take reasonable measures to adequately preserve this evidence.

Such a rule protects not only the due process rights of the defendant, but also society's interest in the integrity of the judicial system. The duty to preserve critical evidence enhances the reliability of the trial process: if an accused is convicted of rape when available evidence would have exonerated him, not only is he unjustly incarcerated but the actual rapist remains at large. 'Law enforcement has failed in its primary function and has left society unprotected from, the depredations of an active criminal.' [citations omitted]. The duty of the prosecution is not simply to obtain convictions, but to " 'fully and fairly present to the court the evidence material to the charge.' "

We reverse the convictions and sentences imposed and order dismissal of all counts against Youngblood. In view of our reversal based on the state's failure to preserve the physical evidence listed above, we need not fully address the question of the state's destruction of other evidence (Youngblood's car) without notice to him. We note, however, that Rule 28.2(e), Ariz. R.Crim.P., 17 A.R.S., governing the disposition of evidence in the custody of the state *following the adjudication of charges*, State v. Superior Court, 127 Ariz. 175, 619 P.2d 3 (1980), requires 10 days' notice "to any person, and his counsel against whom the item has been or may be used as evidence." The parties' stipulation that the car was impounded, later released to the towing company and then dismantled and sold because the registered owner did not claim it, does not affect Youngblood's right to notice under Rule 28.2. The exculpatory nature of the evidence in the car is clear: it would have corroborated several witnesses' statements and greatly strengthened Youngblood's defense of misidentification.

Reversed.

LIVERMORE, P.J., and BIRDSALL, J., concur.