265 N.J. Super. 577 (1993)
628 A.2d 372
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
CHARLES BRENT, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted March 24, 1993.
Decided July 6, 1993.
*579 Before Judges HAVEY, STERN and BROCHIN.
Zulima V. Farber, Public Defender of New Jersey, attorney for defendant-appellant (Toni M. Seguin, designated counsel, of counsel and on the brief).
Robert J. Del Tufo, Attorney General of New Jersey, attorney for plaintiff-respondent (Jeffrey L. Weinstein, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by STERN, J.A.D.
Defendant was convicted by a jury of first degree kidnapping, N.J.S.A. 2C:13-1b (count one), and first degree aggravated sexual assault, N.J.S.A. 2C:14-2a (count two). Pursuant to N.J.S.A. 2C:13-1c, the trial judge merged the aggravated sexual assault conviction into the conviction for kidnapping and sentenced defendant to life imprisonment with twenty-five years to be served before parole eligibility.
On this appeal defendant argues:
POINT I: EYEWITNESS IDENTIFICATIONS BY THE VICTIM AND GILLIAM BASED UPON A ONE-MAN SHOWUP WHERE IMPROPERLY ADMITTED WITHOUT A WADE HEARING AND VIOLATED DEFENDANT'S RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL. (NOT RAISED BELOW AS TO GILLIAM).
POINT II: THE SURPRISE IN-COURT IDENTIFICATION BY BARLOW WITHOUT A HEARING TO DETERMINE ITS SUFFICIENCY, ITS RELIABILITY OR THE PRESENCE OF A DISCOVERY VIOLATION; AND THE DENIAL OF A MISTRIAL UPON THE SURPRISE AND BELATED REVELATION THAT SHE HAD VIEWED AND FAILED TO IDENTIFY DEFENDANT'S PICTURE IN A POLICE PHOTO ARRAY, DENIED DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL.
POINT III: THE BAD FAITH ACTIONS OF THE POLICE IN MANIPULATING AND CONCEALING EYEWITNESS TESTIMONY, AND IN THE WILLFUL DESTRUCTION AND NON-COLLECTION OF KEY PHYSICAL EVIDENCE, DEPRIVED DEFENDANT OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL. (NOT RAISED BELOW).

*580 POINT IV: TRIAL COURT EVIDENTIARY RULINGS VIOLATED THE RULES OF EVIDENCE AND IN THE AGGREGATE DENIED DEFENDANT'S RIGHT TO A FAIR TRIAL.
POINT V: THE TRIAL COURT ERRED IN REFUSING TO CHARGE CRIMINAL RESTRAINT AS A LESSER INCLUDED OFFENSE OF KIDNAPPING.
POINT VI: THE SENTENCE IMPOSED BY THE TRIAL COURT WAS EXCESSIVE.
With one exception, we reject defendant's claims addressed to the convictions. We agree with defendant that the trial judge should have honored defendant's request to charge criminal restraint as a lesser offense to kidnapping. In so doing, however, we note that our conclusion does not affect the aggravated sexual assault conviction which was merged into the kidnapping. Defendant need not be retried for the aggravated sexual assault. Hence, if the State elects not to retry defendant on the kidnapping charge, or if defendant is ultimately convicted of a lesser offense or acquitted on count one, the conviction on count two may be resurrected and defendant may be sentenced thereon.

I.
At approximately 7:30 a.m. on September 11, 1989, M.C., then a thirteen year old student at Plainfield High School, was walking to school when she was approached by a man on a bicycle. The sun was shining, and she had a "very clear" view of his face. She described him as 21 or 22 years old, "about 6 feet" tall and "muscular," with "short and frizzy" hair and a goatee. He wore a black short sleeve shirt and pants. She did not recognize him.
The man stopped three or four feet away from M.C. and asked her "to go into a house with him." She refused. He then told her to wait while he took his bike into a house on the street. However, M.C. was scared, and she hurried toward a bus stop where she knew that her mother and brothers were waiting for a bus. The man followed and he grabbed her "from around [her] waist" and "dragged [her] across the street" to a vacant lot. The man threw her on the ground, knelt on top of her, and hit her with his fist *581 "two to 3 times" on the face. Her efforts to escape were unsuccessful.
The man then "dragged" M.C. into an area "where there were a lot of trees." She tried to run away, but he pulled her pants and underwear down around her feet. He then "threw [her] on the ground" again. During this time M.C. had a close look at the perpetrator's face which was "very close and very clear."
The man "took his pants off" and raped M.C. Upon hearing noise from the direction of the street, "[a]s if someone was walking into that area," the assailant "stood up" and ran away. M.C. put her pants back on and returned to the street where she was met by an ambulance squad which had arrived in response to a police radio transmission. As he arrived, Moises Zambrana, one of the ambulance workers, saw a man being chased out of the woods by a police officer. He observed that M.C.'s face was "bruised and very bloody." She was crying and immediately told him that she had been punched and raped by a man who stopped her on the way to school.
Judy Barlow, who lived across from the lot, witnessed some of the events. While Ms. Barlow was getting ready to go to work, she heard a scream outside her window. When she looked out of her window, she saw a man holding a girl "around the waist" and "carrying her" across the street. Barlow also saw him throw "her on the ground and he was kneeling on top of her and then he hit her." Barlow called the police and asked them to "please hurry." After making the call, Ms. Barlow could not see the victim or assailant, but she heard screams and "muffled noises" coming from the lot.
A minute or so after her call, Barlow saw a police officer arrive. She watched him get out of his car and walk "into the bushes" on the lot. Because she continued to hear "muffled sounds" from the lot, Ms. Barlow ran downstairs and out the front door.
As Barlow stood on the walkway in front of her home, she saw "a guy running out of the bushes and zipping his pants." She *582 further testified that, while she did not get a good look at his face when she first saw him carrying the girl across the street, she did see his face when he emerged from the woods. She estimated that at that point, as he ran across the street coming toward her, he was "approximately 13 to 15 feet" away from her. He then turned and began running down the street. As he ran away, the officer came "out of the other side of the bushes," radioed for backup and pursued the suspect on foot.
Over objection, Ms. Barlow made an in-court identification of defendant as the individual she saw running out of the bushes and down the street.
Officer Michael Gilliam was the policeman who responded to Ms. Barlow's call to the police. When he arrived and entered the woods he saw a male, naked from the waist down, "lying on top" of a female "having vaginal intercourse." The man was "looking around in all directions" and Gilliam got a look at his face.
As Gilliam approached, the man ran. Concerned that the suspect might have a weapon, and as he could not "prevent the act from already happening," Gilliam took no immediate action. He radioed for back-up assistance and gave a description of the man. Gilliam then chased the suspect coming to within about twenty feet. As the suspect jumped a fence, "he ran right out of his black shorts." Gilliam radioed the back-up unit that the suspect was now in a "black te[e]-shirt and white boxer type underwear," running through yards.
When the suspect reached an apartment house he entered the building. At that point Gilliam lost view of him. However, shortly thereafter Gilliam received a radio message from Officer David Guarino and went to the rear of the apartment building on to Essex Street. There he saw Guarino "kneeling over" the same man Gilliam had been chasing, wearing the same white boxer shorts and black tee-shirt. Gilliam estimated that about one and a half minutes passed from the time the suspect entered the apartment building and the time he saw defendant in handcuffs with Guarino. He immediately told Guarino he was "positive" the man *583 in custody was "the same individual" as he had seen "on top of the girl." The suspect was put in the patrol car while Gilliam "retrieved the black shorts" that had fallen during the chase. At trial, Gilliam identified defendant as the man he had observed and chased.
Officer Guarino, who had responded to Gilliam's "radio transmissions," saw the suspect come running out of a back yard and run across Essex Street. As he pursued the suspect, Guarino saw him run into the side of a car, "roll[] over the hood" and fall onto a sidewalk. The man got up and kept running, but Guarino caught up with him. The suspect was "sweating profusely" and "had pieces of leaves, shrubbery, vegetation in his hair, on his clothes." His face was also bloody.
Defendant testified on his own behalf that he was on his way to his brother's apartment when Gilliam ran up behind him and "hit [him] with a nightstick." Defendant, "fearing for [his] life," ran away. He further testified that the black shorts he was wearing were ripped off as he "jumped" over a fence. He denied attacking or assaulting the victim. On cross-examination, defendant admitted that he did not know the street number or the apartment number of his brother's apartment.
After defendant's arrest, members of the police department took him to the ambulance where M.C. was being treated. The ambulance was parked in such a way that M.C. could "look out the window" to see the man brought to the scene. M.C. "looked out the [ambulance] window" and told ambulance worker Zambrana that she recognized defendant as the assailant.

II.
The proofs were strong, and we are convinced beyond a reasonable doubt that any error relating to the introduction of evidence was harmless. We comment only upon a few of defendant's contentions.
*584 Although defendant argues that M.C. and Gilliam's photographic identifications were the product of one-on-one show ups, there was no objection to Gilliam's identification at trial. We reject defendant's arguments that the identifications at or near the scene of the crime during the initial investigation, at and close to the time of apprehension, were inadmissible. See State v. Wilkerson, 60 N.J. 452, 461, 291 A.2d 8 (1972) (approving "one-on-one identifications made at the scene of the initial observation  whether or not it be the scene of the crime  or within a reasonably short time thereafter"); State v. Matlack, 49 N.J. 491, 498, 231 A.2d 369 (1967), cert. denied, 389 U.S. 1009, 88 S.Ct. 572, 19 L.Ed.2d 606 (1967); State v. Thomas, 107 N.J. Super. 128, 257 A.2d 377 (App.Div. 1969).
Defendant also challenges the in-court identification of Ms. Barlow. She testified that she had seen the attacker twice, first when he carried M.C. across the street and again when he came running out of the woods with Officer Gilliam in pursuit. Barlow testified that on the second occasion she saw his face. The prosecutor thereafter asked if she saw the perpetrator in court. When she answered in the affirmative, defendant objected because he was "never given any indication in the discovery that she can actually identify or make an identification." In fact, the police report which was provided in discovery indicated that Ms. Barlow said she could not identify a photograph because "I did not get a full look at him, but his eyes looked squinty or small as he ran across." The judge permitted Barlow to make the in-court identification, ruling that the absence of a pretrial identification went to the weight rather than the admissibility of the testimony.
While the in-court identification was substantively admissible, State v. Madison, 109 N.J. 223, 239-43, 536 A.2d 254 (1988), defendant argues that by failing to inform the defense of Ms. Barlow's inability to identify defendant from a photographic display, the State violated the requirement of Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215, 218 (1963), that the State disclose all material evidence affecting the credibility *585 of a government witness. See also State v. Marshall, 123 N.J. 1, 171-207, 586 A.2d 85 (1991).
The State concedes that Barlow's inability to identify defendant from a photographic line-up was material evidence, favorable to the defense, which should have been disclosed before trial. It maintains, however, that since the Brady rule applies only where information is not discovered by the defendant until after trial and this piece of information emerged in the middle of trial, no discovery violation occurred. See State v. Carter, 91 N.J. 86, 111, 449 A.2d 1280 (1982), (citing United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342, 349 (1976)). The State also points to the fact the trial judge found no bad faith by the prosecution. However, Brady expressly disallows good faith as a defense to a violation of its rule, finding such a violation to infringe on defendants' due process rights "irrespective of the good faith or bad faith of the prosecution." Brady, supra, 373 U.S. at 87, 83 S.Ct. at 1186, 10 L.Ed.2d at 218. Nonetheless, as the trial judge pointed out, defendant had the opportunity to cross-examine Barlow on the fact she could not pick defendant's photo from the array shown to her close to the time of the crime. The issue was fully developed at trial, and defendant cannot have been prejudiced by the prior non-disclosure. See State v. Marshall, supra, 123 N.J. at 199-201, 586 A.2d 85.[1]
Defendant also contends that he was prejudiced by the State's failure to disclose in advance that Ms. Barlow would be asked to make an in-court identification of defendant. However, the prosecutor stated he did not know "before she walked into this courtroom whether she could make an identification or not" and that Ms. Barlow did not know until she actually saw the defendant. Even if the prosecutor hoped she could identify defendant in court, it could not be guaranteed. All the State had to do was *586 provide defendant with copies of her pretrial statements and reports of same. See R. 3:13-3(a)(7), (8), (9), (f); R. 3:17. In the absence of exclusion because of undue prejudice, so long as the State fully complied with R. 3:13-3 and provided all it had in its "custody, possession or control" regarding the witness, it could ask that witness questions beyond those embodied in prior interviews and statements.

III.
Defendant claims his due process rights were violated because the police acted in bad faith by not acting to preserve and have tested the live sperm located immediately after the crime. We reject the claim under Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), which, like this case, involved a young sexual assault victim. In Youngblood, a hospital physician took samples from the sodomy victim's rectum immediately after the crime. However the doctor did not attempt to test the samples for semen type until it was too late to obtain meaningful results. Defendant's ultimate conviction thus rested primarily on the victim's eyewitness testimony.
The Arizona Court of Appeals reversed the conviction on due process grounds, holding that "`when identity is an issue at trial and the police permit the destruction of evidence that could eliminate the defendant as the perpetrator, such loss is material to the defense and is a denial of due process.'" 153 Ariz. 50, 54, 734 P.2d 592, 596 (1986) (quoting State v. Escalante, 153 Ariz. 55, 61, 734 P.2d 597, 603 (App. 1986)). A majority of the United States Supreme Court, however, reversed on the constitutional question and remanded, holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Youngblood, supra, 488 U.S. at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 289. Failure to preserve potentially exculpatory test results was not involved.
*587 Defendant has failed to establish bad faith. The record reveals that after the doctor had identified the substance extracted from the victim's vagina as semen containing live as well as dead sperm, she asked Detective Wilson if he wanted her to save the slide. The doctor asked if he would like the sperm as part of the sex crimes kit; the detective made a phone call to determine if the slide would be necessary and then told her that he would not need it.
While wiser investigative practice might have dictated saving all possible evidence even if it appeared duplicative, the failure to do so in these circumstances does not amount to a denial of due process. There is no reasonable suggestion or support for the proposition the police acted in bad faith.

IV.
Defendant claims that the kidnapping conviction must be reversed because the trial judge declined his request to charge criminal restraint as a lesser included offense to the kidnapping for which he was charged. We agree that criminal restraint should have been charged to the jury at defendant's request, whether or not it is an elemental lesser included offense of the kidnapping for which defendant was indicted.
In count one defendant was indicted for "unlawfully remov[ing] M.C., a child 13 years of age ..., a substantial distance from the vicinity where she was found with purpose to facilitate the commission of a crime or flight thereafter."[2] That charge alleges a crime under that portion of N.J.S.A. 2C:13-1b which proscribes "unlawfully remov[ing] another ... a substantial distance from the vicinity where he is found ... [t]o facilitate commission of any crime or flight thereafter." N.J.S.A. 2C:13-1b(1).[3] *588 Criminal restraint requires proof of restraint of "another unlawfully in circumstances exposing the other to risk of serious bodily injury." N.J.S.A. 2C:13-2a. In this case of the second count of the indictment alleges that the defendant committed sexual penetration upon a child 13 years of age "during the commission or attempted commission of kidnapping". Consequently, defendant was on notice of the allegation that he "removed" M.C. a "substantial distance" to commit aggravated sexual assault. That crime necessarily involves the "risk of serious bodily injury." Thus, criminal restraint can be said to be a lesser included offense to kidnapping by removal for a "substantial distance" where the State had to prove that the kidnapping was to facilitate an aggravated sexual assault. See N.J.S.A. 2C:1-8d.
Kidnapping by removal a "substantial distance" under N.J.S.A. 2C:13-1b does not always require proof of a crime which involves the "risk of serious bodily injury," while criminal restraint under N.J.S.A. 2C:13-2a does. Therefore the latter requires proof of an element or fact the former may not. See N.J.S.A. 2C:1-8d(1). We nevertheless conclude that criminal restraint should have been charged to the jury here as a lesser offense at defendant's request. We so conclude because judges are now required to instruct juries on non-elemental lesser offenses, at the defendant's request, where warranted by the evidence. See State v. Sloane, 111 N.J. 293, 544 A.2d 826 (1988); see also State v. Crisantos, 102 N.J. 265, 278, 508 A.2d 167 (1986), State v. Powell, 84 N.J. 305, 419 A.2d 406 (1980). State v. Battle, 256 N.J. Super. 268, 606 A.2d 1119 (App.Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1992).
In State v. Battle, defendant was indicted for escape, but convicted of preventing a law enforcement officer from effectuating *589 an arrest. We upheld that conviction for the lesser offense. Judge Skillman comprehensively explained the status of the law concerning presentation of non-elemental lesser offenses to the jury:
Since escape requires proof that a defendant was under arrest, N.J.S.A. 2C:29-5a, and resisting arrest requires proof that a defendant prevented a law enforcement officer from effectuating an arrest, N.J.S.A. 2C:29-2a, each offense requires proof of an additional element not required by the other. However, it is now recognized that "in certain circumstances, subject to the requirements of fair notice, an offense, if supported by the evidence, should be charged to the jury even though it does not meet the Code's definition of lesser-included offense." State v. Purnell, 126 N.J. 518, 531, 601 A.2d 175 (1992) (quoting State v. Mancine, 124 N.J. 232, 265, 590 A.2d 1107 (Stein, J., concurring)); accord State v. Ciuffreda, 127 N.J. 73, 602 A.2d 267 (1992); State v. Sloane, 111 N.J. 293, 299-304, 544 A.2d 826 (1988); see also State v. LeFurge, 101 N.J. 404, 502 A.2d 35 (1986); State v. Talley, 94 N.J. 385, 466 A.2d 78 (1983).
........
In the absence of a valid waiver, the submission to the jury of an offense which is not a lesser included offense violates a defendant's state constitutional right not to be tried except upon "the presentment or indictment of a grand jury." N.J. Const. art. I, ¶ 8. State v. Ciuffreda, supra; see also State v. Wagner, 180 N.J. Super. 564, 435, A.2d 1190 (App.Div. 1981). On the other hand, the failure to submit a lesser offense to the jury which does not satisfy the Code's definition of a lesser-included offense may under some circumstances violate the due process guarantees of the federal and state constitutions. State v. Purnell, supra, 126 N.J. at 530-34, 601 A.2d 175; cf. Schad v. Arizona, 501 U.S. ___, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).
[256 N.J. Super. at 280-81, 606 A.2d 1119.]
Thus, independent of a capital prosecution which is sui generis, see State v. Purnell, supra, where there is a rational basis in the evidence, a non-elemental lesser included or lesser offense, not the subject of indictment, is properly presented to the jury upon defendant's consent or request.[4]
*590 Here, defendant requested the instruction on the lesser crime of criminal restraint, and as there was a basis in the evidence for the charge,[5] it should have been given. Accordingly, the kidnapping conviction must be reversed and remanded for a new trial.

V.
As noted at the outset, reversal of the kidnapping conviction does not affect the aggravated sexual assault conviction. If the State elects to retry defendant for the kidnapping, sentencing on the aggravated sexual assault should abide the event. We note, however, that N.J.S.A. 2C:13-1c requires conviction on both the kidnapping and aggravated sexual assault to trigger the enhanced sentencing provisions of that section. While that statute also requires merger, "for purposes of sentencing," of the kidnapping and the "aggravating crime" (here the aggravated sexual assault violation of N.J.S.A. 2C:14-2, see N.J.S.A. 2C:13-1c(2)(a)), it does not require us to order a retrial of the aggravated sexual assault case merely because of the failure to charge a lesser included offense to kidnapping.
We conclude that defendant's contentions not addressed herein do not warrant further discussion. R. 2:11-3(e)(2).
The kidnapping conviction is reversed, and the matter is remanded for further proceedings consistent with this opinion.
NOTES
[1] The requirement to provide exculpatory information is an obligation independent of the discovery rules. See State v. Marshall, supra, 123 N.J. at 183-84, 586 A.2d 85.
[2] The indictment also alleged that defendant "fail[ed] to release the said M.C. unharmed prior to apprehension," and the jury so found.
[3] N.J.S.A. 2C:13-1b also proscribes unlawful confinement "for a substantial period," but this aspect of kidnapping was not alleged. "[C]riminal restraint can constitute kidnapping under the Code's definition," State v. LaFrance, 117 N.J. 583, 585, 569 A.2d 1308 (1990), and thus may be a lesser included offense of kidnapping by confinement "for a substantial period."
[4] In State v. Dixon, 125 N.J. 223, 257-58, 593 A.2d 266 (1991), the Supreme Court stated the general principle with regard to requests for charges by the prosecutor:

As a general rule a criminal defendant may not be convicted for an offense not charged in the indictment, but a trial court may instruct a jury on lesser-included offenses of the crime charged in the indictment on the prosecutor's request when there is a rational basis for the charge and when the defendant consents. (Emphasis added).
[5] While there was more than sufficient evidence to prove movement a "substantial distance," thus enhancing the risk of danger to the victim, that was a question for the jury to decide. See State v. Masino, 94 N.J. 436, 447, 466 A.2d 955 (1983). See also State v. Sloane, supra.